**ATLANTIC STATES LEGAL FOUNDATION, INC.,**
**Plaintiff,**

v.

**UNIVERSAL TOOL & STAMPING CO., INC., Defendant.**

**Civ. No. F 87–95.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

April 23, 1990.

Peter G. Mallers, II, Beers, Mallers, Backs & Salin, Fort Wayne, Ind., Richard J. Kilsheimer; Kaplan, Kilsheimer & Foley, New York City, for plaintiff.

Milford M. Miller, Edward J. Liptak, Livington, Dildine, Haynie & Yoder, Fort Wayne, Ind., for defendant.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on defendant's motion for summary judgment filed on September 15, 1988 and plaintiff's motion for partial summary judgment filed on September 23, 1988. On November 10, 1988 the defendant responded to the plaintiff's motion for partial summary judgment and on November 14, 1988 the plaintiff responded to defendant's motion for summary judgment. A hearing was held on the motions on August 23, 1989. On January 29, 1990 plaintiff filed a supplemental submission in support of motion for partial summary judgment and in opposition to defendant's motion for summary judgment. Also on January 29, 1990 the defendant filed a supplemental affidavit in support of motion for summary judgment. On February 27, 1990 the defendant responded to

plaintiff's supplemental submission and on March 2, 1990 the plaintiff responded to defendant's supplemental submission.

### Summary Judgment

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*, 106 S.Ct. at 2512; *In re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Tp. High School Dist. No. 204*, 802 F.2d 981, 986 (7th Cir. 1986).

■ Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact, *Celotex*, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment.

*Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 106 S.Ct. at 2511.

■■■■ Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 106 S.Ct. at 2512.

1. Plaintiff is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business in Syracuse, New York. Plaintiff is a membership organization with members in the State of Indiana and is dedicated to protecting and restoring the natural resources, particularly the water resources, of the United States.

2. On April 28, 1984 defendant was issued NPDES permit number IN 0000639 by the Indiana Stream Pollution Control Board. On January 1, 1974 the Administrator of the EPA authorized the Indiana Stream Pollution Control Board to issue NPDES permits within Indiana, pursuant to section 402(a) and (b) of the Clean water Act, 33 U.S.C. § 1342(a) and (b).

## Factual Background

Plaintiff, Atlantic States Legal Foundation, Inc. (Atlantic)[1], has brought a citizen's suit under § 505 of the Clean Water Act, 33 U.S.C. § 1365, against Universal Tool & Stamping Co., Inc. (Universal) alleging that Universal has repeatedly violated the terms and conditions of its National Pollutant Discharge Elimination System (NPDES) permit under circumstances warranting the imposition of civil penalties and the award of attorney fees and costs.

Universal operates a manufacturing plant which is located on U.S. Route 6 just west of the municipal limits of the City of Butler in DeKalb County, Indiana. Universal manufactures jacks for the automobile industry. The manufacturing process involves machining bar and flat stock steel which is then protected from corrosion by a process of phosphating and painting and by zinc plating with a decorative chrome chemical coating.

Universal received its first NPDES permit in 1975 and has had several since that time. The permit which is the basis of this lawsuit became effective on April 28, 1984[2] and was to expire on February 28, 1989. This permit authorized Universal to discharge wastewater containing limited quantities of pollutants from outfalls[3] 001 and 101 into the Teutsch Ditch[4]. At outfall 101 the wastewaters that Universal discharged into Teutsch Ditch from its phosphating, painting, zinc plating and chrome coating manufacturing procedures were monitored after the wastewaters had

3. "Outfall" is a term used for a discharge point.

4. The Teutsch Ditch and its tributaries are navigable waters of the United States. The waters of Teutsch ditch flow into Big Run Creek approximately .7 of a mile east of outfall 001 from which point Big Run Creek flows eastward into the State of Ohio where it empties into the St. Joseph River approximately 6 miles east of outfall 001. Water entering Teutsch Ditch at outfall 001 travels approximately 25 miles before passing by the Filtration Plant within the municipal limits of Fort Wayne, Indiana.

passed through Universal's wastewater treatment facility. These waters then combined with wastewaters which had moved through the manufacturing system as non-contact cooling waters. Just before entry of these combined waters into Teutsch Ditch, the wastewater was monitored at outfall 001. Under its permit, defendant was required to establish and maintain records, install, use and maintain monitoring equipment, sample effluents, and report[5] on a monthly basis to the state of Indiana regarding defendant's discharge of pollutants.

From the inception of its April 1984 permit, Universal had difficulty achieving continuous compliance with its permit. In January 1985, Universal received a Notice of Violation from the State of Indiana for violations of its NPDES permit requiring that Universal's processes for wastewater treatment be reviewed. Universal submitted a proposal to the State involving a series of tasks which it was believed would bring Universal back into compliance with its NPDES permit by June 30, 1985. However, continuous compliance with the NPDES permit was not achieved; and, on September 20, 1985, the State of Indiana issued an Order of Compliance issued for violations of Indiana Stream Pollution Control Board Rule 330 IAC 5 (since amended), which provided for a penalty of up to $25,000.00 per day per violation. On May 15, 1986, the State advised Universal of the results of a compliance sampling survey which the State had conducted on January 21–22, 1986. The results showed that the revisions made by Universal to its system had failed to bring about full compliance and a different approach was needed.

Having failed to achieve full compliance with its NPDES permit utilizing the recommendations of its Certified Waste Treatment Operator, Universal sought the help of an environmental engineer, Scott O. Lougheed, in June of 1986. Mr. Lougheed was hired to undertake an extensive study of Universal's manufacturing processes and wastewater treatment system so as to plan whatever was needed to obtain continuous, uninterrupted compliance with the 1984 NPDES permit. This effort, referred to as a Plant Assessment, was already underway when, on or about September 15, 1986, Atlantic gave notice to Universal of violations of its NPDES permit and of plaintiff's intent to file suit[6]. Atlantic commenced this action on or about April 9, 1987[7].

As part of Universal's response to the State's initial enforcement action, an Interlocutory Consent Decree was entered into between Universal and the State on November 14, 1986. Following an exchange of information, continued negotiation and agreements as to further compliance schedule dates, Universal and the State entered into a Final Consent Order which was adopted on July 13, 1987. The Final Consent Order provided, among other things, that it was subject to being set aside upon successful petition by interested persons. Notice of publication was given in Marion County and DeKalb County, and a copy was given to Atlantic's counsel. The Final Consent Order, which provides for $40,000.00 in fines, with $30,000.00 thereof being waived upon successful and timely completion of designated tasks, established a sequence of tasks which were to culminate with Universal's new wastewater treatment system achieving effective, continuous and uninterrupted compliance with its NPDES permit on or before September 1, 1988.

### Universal's Motion for Summary Judgment

Universal claims that the compliance specified by the Final Consent Order has

---

5. The reports are known as Discharge Monitoring Reports (DMRs).

6. Copies of this notice were also forwarded to the Administrator of the United States Environmental Protection Agency (EPA) and to the Indiana Department of Environmental Management (IDEM), as required by § 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).

7. Plaintiff claims that more than sixty days had passed since notice of Universal's violations of its NPDES permit was given to the EPA and the IDEM and neither the EPA nor the IDEM had commenced or was diligently prosecuting an action to address these violations.

been achieved and that no violations of the interim permit limits established by the Final Consent Order have occurred since November 6, 1987. Universal further states that, since July 1, 1987, it has exceeded interim permit limits only on three days in September, 1987, when an electrode sensor became inoperative, and one day in November, 1987, when a tank developed a leak.

In its motion for summary judgment, Universal advances four grounds for the barring of any relief to Atlantic: (1) lack of standing; (2) diligent prosecution of an administrative action by the Indiana Department of Environmental Management; (3) mootness; and (4) the unconstitutionality of the statute authorizing a citizen's suit.

### I. STANDING

■ The doctrine of standing is based upon Article III of the United States Constitution, which limits the judicial power of the federal courts to resolution of actual cases and controversies. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In terms of its Article III requirement, "the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The constitutional requirements for standing, injury in fact, causation, and redressability, were clearly summarized in *Valley Forge Christian College v. Americans United,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The Court stated:

[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal

conduct of the defendant,' *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.' *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

*Id.,* 102 S.Ct. at 758.

■ As noted above, Atlantic brought this action pursuant to § 505 of the Clean Water Act, 33 U.S.C. § 1365, which authorizes any "citizen" to commence a civil action on his own behalf against a person who is alleged to be in violation of the Act.[8] "Citizen" is defined as "a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). In interpreting this section of the Clean Water Act, the United States Supreme Court has stated that:

It is clear from the Senate Conference Report that this phrase was intended by Congress to allow suits by all persons possessing standing under this Court's decision in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). See S.Conf.Rep. No. 92–1236, p. 146 (1972). This broad category of potential plaintiffs necessarily includes both plaintiffs seeking to enforce these statutes as private attorneys general, whose injuries are "noneconomic" and probably noncompensable, and persons like respondents who assert that they have suffered tangible economic injuries because of statutory violations.

*Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981).

Universal contends that none of Atlantic's members have suffered a redressable harm as a result of Atlantic's allegedly

---

8. Section 1365 of the Clean Water Act is entitled "Citizen Suits" and provides in pertinent part:

 **(a) Authorization; jurisdiction**

 Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

 (1) against any person (including (i) the United States, and (ii) any other governmental in-

strumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation....

illegal discharges and, therefore, Atlantic fails to meet the requirements for standing set forth in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). In *Sierra Club,* a conservation organization brought an action to enjoin development of a national game refuge. The Sierra Club asserted that it had standing to maintain that action based upon its special interest and expertise in environmental matters. The Supreme Court, while recognizing that injuries to environmental or aesthetic interests could suffice to establish standing, held that the Sierra Club lacked standing. The Court stated that "the injury in fact test requires more than an injury to a cognizable interest. It requires that the party seeking review to be himself among the injured." *Id.,* 92 S.Ct. at 1366. Because the Sierra Club failed to show that any of its members suffered an injury as a result of the development, there was no standing. As the Supreme Court stated:

> The Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the Disney development. Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents.

*Id.*

Defendant argues that Atlantic, like the Sierra Club, has failed to demonstrate that its members have personally suffered distinct and palpable injuries from defendant's allegedly illegal discharges. Defendant further argues that Atlantic's members are, at best, merely concerned about pollution of the local waters and that their alleged injuries are neither traceable to Universal's discharge nor redressable by the relief sought in this case. Due to these alleged deficiencies, defendant asserts that Atlantic's suit should be dismissed.

In response, Atlantic claims that the defendant does not understand the proper application of the standing requirements to persons attempting to establish standing under the Clean Water Act. Atlantic claims that to satisfy the first requirement for standing, injury in fact, a plaintiff suing under the Clean Water Act need only show that defendant violated its NPDES permit limitations and that plaintiff, through its members, used the affected waterways in some manner. Thus, Atlantic is asserting that, under the Clean Water Act, a plaintiff need not show that its members were physically or economically harmed by defendant's violations. The case law clearly supports Atlantic's position that "injury" for standing purposes can be injury to aesthetic, recreational, or environmental values. In *Natural Resources Defense Council, Inc. v. Outboard Marine Corp.,* 692 F.Supp. 801 (N.D.Ill. 1988), the district court held that:

> It is enough for NRDC to show its members use the water into which OMC's allegedly illegal discharges flow.... Such standing is not undermined because NRDC's members have not explicitly said they are harmed by OMC's permit violations. It is enough that they identify harm to their aesthetic or environmental interests from the overall pollution of the waterways. If OMC is proved to be violating the terms of its permit, that alone constitutes injury to those using the affected waters.

*Id.* at 807–08. *See also Student Public Interest Research Group v. P.D. Oil & Chemical Storage,* 627 F.Supp. 1074 (D.N. J.1986); *Student Public Interest Research Group v. AT & T Bell Laboratories,* 617 F.Supp. 1190 (D.N.J.1985). In the present case, Atlantic has submitted deposition testimony of two of its members who live in the region of Tuetsch Ditch, Big Run Creek, and the St. Joseph River. These individuals describe various actual and potential detrimental impacts on their aesthetic, recreational, and conservational interests due to pollution to these waters. Therefore, under the Clean Water Act, Atlantic, through its members, has alleged sufficient injury to satisfy the first requirement of standing.

Atlantic further claims that its members also satisfy the second and third require-

ments for standing. That is, the defendant's violations of its NPDES permit caused the injuries alleged by Atlantic's members and a favorable decision by this court would redress those injuries. As noted above, defendant has argued that Atlantic lacks standing because defendant's violations of its NPDES permit were so minimal that they did not harm plaintiff's members and therefore, the members' injuries were not caused by the defendant and would not be redressed by a favorable decision. In support of its motion for summary judgment, defendant offers the testimony of a professional engineer, Fred G. Krikau. Krikau states that his research indicates that for the period from January 1, 1980 through August 31, 1988, no aquatic life, plant life or wildlife in or adjacent to the waters of Teutsch Ditch, Big Run Creek or the St. Joseph River in the stretch from defendant's outfall 001 to the Filtration Plant at Fort Wayne, Indiana was harmed by any effluent discharge from defendant governed by its NPDES permit.

■ Atlantic asserts that the Clean Water Act presumes unlawful discharges to reduce water quality because definite proof of the proposition is often nearly impossible. Atlantic claims that, under the Clean Water Act, the focus is on the *quantity* of pollutants discharged by *each* polluter and not the quality of the waters and thus defendant's assertions that its permit violations did not cause the water to become discolored, unsafe to drink, or unfit for animal life, even if true, are irrelevant in determining Atlantic's standing to sue based on its members' injuries. Again, the

case law clearly supports Atlantic's contentions. In *Student Public Interest Research Group v. Georgia–Pacific*, 615 F.Supp. 1419 (D.N.J.1985), the district court held that:

> Plaintiffs need not show that this lawsuit will restore the Delaware to a pristine state, only that defendant's role in polluting the river may be lessened thereby. For purposes of establishing standing to sue, the size of the injury is not a valid criterion for determining whether an injury has occurred at all. In *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the Court rejected an invitation to limit standing to those "significantly" affected by an alleged wrong. Instead, the Court held that plaintiffs may sue so long as they can demonstrate an "identifiable trifle" constituting actual or threatened injury, because such harm is sufficient to guarantee that plaintiffs have a concrete interest in the outcome of the litigation. 412 U.S. at 689 n. 14, 93 S.Ct. at 2417, n. 14. *See Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Congress has identified NPDES violations, however trifling, as injurious to persons such as plaintiffs' members, who use bodies of waters into which a permittee's effluents flow.

*Id.* at 1424.

Applying these principles to the present case, Atlantic clearly has satisfied the second requirement of standing. Universal, by violating its NPDES permit, has polluted the water which Atlantic's members use thereby causing them injury[9]. The court

9. In its supplemental submission filed January 29, 1990, Atlantic directs the court's attention to the fact that the State of Indiana and the Federal Government have arguably designated the Teutsch Ditch as a polluted body of water.

Pursuant to § 304(*l*) of the Clean Water Act, as amended by the Water Quality Act of 1987, 33 U.S.C. § 1314(*l*), the States were required to establish lists of impaired waters which cannot reasonably be expected to attain or maintain water quality standards. These lists are classified as the "short list", the "medium list" and the "long list". On or about February 24, 1989, the State of Indiana listed the Teutsch Ditch on both the "short list" and the "medium list". The "short list" identifies Universal Tool as the point

source of toxic pollutants, and specifies the pollutants of concern as toxic heavy metals. The inclusion on the "short list" and the "medium list" of Teutsch Ditch as an impaired waterway and Universal Tool as the source of the toxic pollution was specifically approved by the Environmental Protection Agency. Atlantic has submitted the "short list" and the "medium list" as exhibits to its supplemental submission.

Universal has tendered the argument that Atlantic's exhibits are inadmissible hearsay evidence because the "short list" and the "medium list" do not set forth any facts upon which the conclusion, that Teutsch Ditch should be placed on either of these lists, could be based. Universal further contends that even if the exhibits are

further finds that Atlantic has satisfied the third requirement of standing in that a favorable decision, requiring defendant to come into compliance with its NPDES permit and/or imposing civil penalties, will redress the injuries alleged by the plaintiff's members. Consequently, the court finds that Atlantic has proper standing to initiate and pursue this lawsuit.

## II. IDEM PROSECUTION

Universal's second argument in support of its motion for summary judgment is that Atlantic is barred from any relief because the Indiana Department of Environmental Management (IDEM) was diligently prosecuting a pending administrative action against Universal at the time Atlantic filed suit. Universal admits that Atlantic has a right to file citizen suits under the Clean Water Act. However, Universal points out that Atlantic's right to file a citizen's suit pursuant to 33 U.S.C. § 1365(b) is not unfettered because Atlantic's complaint could only be filed after giving Universal at least 60 days notice of its intention to file the action [10]. Then, if the EPA Administrator or the IDEM had filed a court action that was being diligently prosecuted at the time of Atlantic's proposed filing, Atlantic's action would be barred [11]. Universal further points out that 33 U.S.C. § 1319(g)(6)(A), a 1987 amendment to the Clean Water Act, imposes yet another potential bar to the filing of Atlantic's action. The 1987 amendment provides that if an administrative action had been filed by the EPA administrator, or by the IDEM under comparable state law, and such administrative action was being diligently prosecuted, or if a final order in such an action had been issued and a penalty paid, then Atlantic's action would be barred.[12] Universal submits that Atlantic is barred from pursuing the present citizen's suit under both § 1365(b) and § 1319(g)(6)(A).

Universal argues that at the time Atlantic filed its complaint on April 17, 1987, an administrative action had been filed and was being duly prosecuted by the IDEM. Universal claims that this administrative action qualifies as a "court action" and, as such, results in the preclusion of Atlantic's claim under § 1365(b). Moreover, Universal argues, the IDEM's administrative action was being diligently prosecuted under

admissible, they do not help Atlantic prove standing because none of its members have any recreational, aesthetic or environmental interest in Teutsch Ditch. As the court has already found that Universal has polluted the water which Atlantic's members use by virtue of violating its NPDES permit, the court need not address the issue of whether Atlantic's exhibits are admissible and does not rely on those exhibits in rendering this decision.

10. 33 U.S.C. § 1365(b)(1)(A) provides:
No action may be commenced
(1) under subsection (a)(1) of this section—
(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order....

11. 33 U.S.C. § 1365(b)(1)(B) provides:
No action may be commenced
(1) under subsection (a)(1) of this section—
 * * * * *
(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require such compliance with the standard, limitation, or order, but in

any such action in a court of the United States any citizen may intervene as a matter of right.

12. 33 U.S.C. § 1319(g)(6)(A) provides:
(6) Effect of order
(A) Limitation on actions under other sections
Action taken by the Administrator or the Secretary, as the case may be, under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation—
(i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection,
(ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection,
(iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,
shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title.

Indiana law which was comparable to the administrative penalty provisions of § 1319(g) and, consequently, Atlantic's action is also precluded by § 1319(g)(6)(A). Finally, Universal argues that Atlantic's citizen's suit does not fall within one of the recognized exceptions to 33 U.S.C. § 1319(g)(6)(B) [13], so as to avoid preclusion by the IDEM's administrative action.

### A. Section 1365(b)

■■■ Universal claims that an IDEM administrative proceeding, which was commenced on September 24, 1985, constitutes the equivalent of an "action in court" under § 1319(b). Universal argues that, under certain circumstances, an administrative proceeding may be the functional equivalent of a court action sufficient under the Clean Water Act to preclude a citizen suit. Universal relies on *Baughman v. Bradford Coal Co.*, 592 F.2d 215 (3rd Cir.1979) to support its argument. *Baughman* set forth the requirements which an administrative proceeding must meet in order to be deemed an "action in court." The *Baughman* test requires that (1) the state agency have coercive powers to compel compliance with effluent limitations and (2) there be procedural similarities to a suit in federal court with citizens having the right to intervene. Universal submits that the IDEM's administrative action against it satisfies the requirements of the *Baughman* test.

In *Baughman*, the Third Circuit decided in what was then a case of first impression, that "an administrative board may be a 'court' if its powers and characteristics make such a classification necessary to achieve statutory goals." [14] 592 F.2d at 217. A primary factor in making this de-

termination was stated by the court as follows:

> [A] tribunal must have the power to accord relief which is the substantial equivalent to that available to the EPA in federal courts under the Clean Air Act.

*Id.* at 219. Accordingly, the *Baughman* court found that an administrative proceeding was not the functional equivalent of a court action if the administrative agency could not assess the same penalty as could be obtained in a court action, or if it lacked statutory authority to enjoin violations without obtaining a court order. Applying this test, the *Baughman* court found that the administrative proceeding at issue there was *not* the equivalent of a court action.

Atlantic argues that, contrary to Universal's assertions, the IDEM administrative action could not be a functional equivalent to an action in a court for the simple reason that IDEM lacks power to enforce its civil penalty and cease and desist provisions without bringing an action in court. IC 13–7–13–1(a), which governs the imposition of civil penalties for violations of IDEM orders, provides:

> Any person who violates any ... determination, permit, or order made or issued by the commissioner ... is liable for a civil penalty not to exceed twenty-five thousand dollars ($25,000) per day of any violation, *which may be recovered in a civil action commenced in any court of competent jurisdiction* by the department, and a request may be made in any such action that the person be enjoined from continuing the violation. (emphasis supplied).

---

**13.** 33 U.S.C. 1319(g)(6)(B) provides:
 (6) Effect of order
 (B) Applicability of limitation with respect to citizen suits
 The limitations contained in subparagraph (A) on civil penalty actions under section 1365 of this title shall not apply with respect to any violation for which—
 (i) a civil action under section 1365(a)(1) of this title has been filed prior to commencement of an action under this subsection, or
 (ii) notice of an alleged violation of section 1365(a)(1) of this title has been given in ac-

cordance with section 1365(b)(1)(A) of this title prior to commencement of an action under this subsection and an action under section 1365(a)(1) of this title with respect to such alleged violation is filed before the 120th day after the date on which such notice is given.

**14.** *Baughman* interpreted a section of the Clean Air Act, 42 U.S.C. § 7604(b)(1)(B), which is similar to Section 505 of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B).

Consequently, since the IDEM lacks power to accord relief which is the substantial equivalent to that available in an action in court, the IDEM cannot be considered the functional equivalent of a court and § 1365(b) does not bar Atlantic from maintaining this suit.

### B. Section 1319(g)(6)(A)

Universal also argues that this action is barred under § 1319(g)(6)(A) of the Act because an administrative penalties action has been brought under state law which is comparable to § 1319(g). Section 1319(g) was added to the Clean Water Act in 1987 and created a totally new procedure for the imposition of administrative penalties. One provision of that statute, § 1319(g)(6)(A), imposes limitations on the bringing of citizen suits for violations which are the subject of such administrative proceedings. That provision precludes a civil penalty action under § 1365 of the Clean Water Act as to any violation with respect to which a State has commenced and is diligently prosecuting an action under a state law comparable to § 1319(g), or which the state has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under § 1319(g) or such comparable state law. Thus, in order to find that § 1319(g)(6)(A) bars this lawsuit, this court must determine whether the Indiana statutes, as written, are "comparable" to § 1319(g) of the Clean Water Act.

Universal argues that as of the time Atlantic filed its complaint initiating the present action, the IDEM had been continuously taking action to bring Universal into compliance with its permit limitations for some time. According to defendant, the IDEM's action against Universal began with its Order of Compliance issued in September, 1985, which lead to the issuance of the Complaint on November 14, 1986 in IDEM Case No. B–1039, and the entry of an interlocutory consent decree on November 14, 1986 requiring Universal's compliance with a number of deadlines. The IDEM's enforcement action culminated in the approval of the Final Consent Order on July 14, 1987, which provided for civil penalties and allowed for public comments and objections prior to becoming effective. Universal states that it has paid a $10,000.00 fine pursuant to the Final Consent Order.

Universal concludes that for both of the reasons specified in § 1319(g)(6)(A) Atlantic's action is barred: (1) the IDEM, pursuant to comparable state law, had commenced and was diligently prosecuting an action against Universal and (2) the IDEM, pursuant to comparable state law, has issued a final order not subject to further judicial review under which Universal has paid a penalty. Universal steadfastly maintains that a comparison of the enforcement provisions of § 1319(g) to those under Indiana law clearly demonstrates that the respective provisions are not only comparable, but virtually identical.

In determining whether the Indiana statutes are "comparable" to § 1319(g) the court notes the remarks by Senator John Chaffee, the principal author and sponsor of the 1987 amendments to the Clean Water Act:

> [T]he limitation of 309(g) applies only where a State is proceeding under a State law that is comparable to section 309(g). For example, in order to be comparable, a State law *must* provide for a right to a hearing and for public notice and participation procedures similar to those set forth in section 309(g); it *must* include analogous penalty assessment factors and judicial review standards; and it *must* include provisions that are analogous to the other elements of section 309(g). (emphasis supplied).

133 Cong. Rec. S737 (daily ed., Jan. 14, 1987).

 Thus, for a state law to be considered "comparable" within the meaning of § 1319(g)(6)(A), the state law must include provisions as to public notice and participation, penalty assessment, judicial review, and other matters comparable to those in § 1319(g). While the defendant asserts that the Indiana law is nearly identical to the federal law, Atlantic points out several deficiencies in the Indiana law as

compared to the federal law. The federal law, § 1319(g)(4), provides that before issuing an order assessing a penalty, the Administrator must provide "public notice of and reasonable opportunity to comment on the proposed issuance of such order." 33 U.S.C. § 1319(g)(4)(A). It also provides that, if a hearing is held, the members of the public who have commented on the proposed penalty shall have the opportunity to be heard and to present evidence at the hearing. 33 U.S.C. § 1319(g)(4)(B). If no hearing is held, members of the public who commented on the proposed order have the right to petition the Administrator to set aside the order and hold a hearing. If the Administrator denies the request for the hearing, he must publish the reasons for the denial in the Federal Register within 30 days of the denial. 33 U.S.C. § 1319(g)(4)(C). Section 1319(g)(8) provides that persons against whom penalties are assessed and persons who have commented on the proposed assessment of a penalty have the right to obtain judicial review of the assessment of the administrative penalty. 33 U.S.C. § 1319(g)(8).

In contrast to these provisions of § 1319(g), IC 13-7-11-2(e) now requires public notice of "hearings", but not of matters concluded by consent decree. Prior to July 1, 1987, when most of the administrative proceedings against Universal occurred, IC 13-7-11-2 did not even require mandatory public notice of "hearings". Rather, notice was merely permissible. Atlantic also points out that there is no Indiana counterpart to § 1319(g)'s provision that members of the public be given a reasonable opportunity to comment upon the penalty assessment. In addition, citizens may not obtain judicial review of administrative orders under conditions similar to those under § 1319(g)(8).[15]

In addition, the Indiana statutes have no comparable provision to § 1319(g)(3) regarding the factors to be considered in assessing a penalty. Section 1319(g)(3) requires that, in imposing a civil administra-

tive penalty, the decisionmaker must consider

> the nature, circumstances, extent and gravity of the violation or violations and, with respect to the violator, ability to pay, any prior history of such violations, the degree of culpability, economic benefit or savings (if any) resulting from the violation and such other matters as justice may require.

33 U.S.C. § 1319(g)(3). In contrast, the pertinent Indiana statutes do not contain any provision which specifies any factors to be considered in assessing a penalty.

It is clear from the foregoing that the statutes under which IDEM brought its administrative proceeding against Universal are not "comparable" to § 1319(g), and therefore that proceeding does not bar the present case. Even if the court would find that the Indiana statutes are comparable to § 1319(g), Atlantic argues that the IDEM did not diligently prosecute Universal's violations, and therefore, § 1319(g)(6)(A) could not bar Atlantic's suit.

In contesting Universal's claims of diligent prosecution by the IDEM, Atlantic points out that Norman Ritenour, Universal's president, informed the IDEM that their administrative proceeding had little effect upon Universal's efforts to comply with its permit and that it was Atlantic's threat of a lawsuit that spurred Universal to action.[16] Atlantic further notes that counsel for Universal "walked through" the Interlocutory Consent Decree for approval in the offices of the IDEM in a single day. This procedure was highly unusual as the approval and signing of such decrees often takes four to six weeks to accomplish. Atlantic concludes that, in light of IDEM's apparent willingness to bend its procedures on Universal's behalf, the fact that Universal continued to violate its permit limitations long after the administrative proceeding was commenced, the lenient penalty assessment of only $10,000 for the hundreds of reported violations,

---

**15.** See IC 13-7-11-2(g) and IC 4-21.5-5.

**16.** Ritenour stated that "he would not have taken any action whatsoever had the Atlantic States

Legal Foundation not initiated an action against him." Bunner transcript at 19-20, 83-84.

despite statutory authority for penalties of $25,000 per violation, and Mr. Ritenour's acknowledgment that it was plaintiff's notice of intent to sue, and not the IDEM administrative proceeding, that had moved Universal to take steps to comply with its permit, it is clear that the IDEM proceeding was not "diligent prosecution" under the Clean Water Act. The court agrees with Atlantic and finds that the IDEM did not diligently prosecute Universal for its violations of the Clean Water Act.

### C. Section 1319(g)(6)(B)

As noted above, Universal's position is that § 1319(g)(6)(A) bars Atlantic's action, because the Indiana law is comparable to the federal law, unless one of the two exceptions specified in § 1319(g)(6)(B) apply. However, the court has determined that § 1319(g)(6)(A) is not applicable to Atlantic's action for the reason that the Indiana statutes under which the IDEM brought its administrative proceeding against Universal are not "comparable" to § 1319(g). Consequently, the court need not discuss Universal's argument that Atlantic fails to fit within the exceptions to § 1319(g)(6)(A).

### III. MOOTNESS

Universal argues in its motion for summary judgment that Atlantic's action should be dismissed on the ground of mootness due to Universal's purported current compliance with the effluent limitations of its NPDES permit.

■■■ The concept of mootness can be traced back to the "case or controversy" requirement under Article III of the United States Constitution. *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 1705, 40 L.Ed.2d 164 (1974). For Article III purposes, "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979), *quoting Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). These principles of mootness prevent the maintenance

of suit when " 'there is no reasonable expectation that the wrong will be repeated.' " *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (quoting *United States v. Aluminum Co. of America*, 148 F.2d 416, 448 (2nd Cir.1945)). In seeking to have a case dismissed as moot, however, the defendant's burden is a "heavy one." 73 S.Ct. at 897. The defendant must demonstrate that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). It is well established that the simple cessation of illegal activity upon the filing of a complaint does not moot a case. *See, e.g., City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982); *United States v. W.T. Grant Co.*, 345 U.S. 629, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953).

■■■ Universal claims that, because of the success of its new wastewater treatment system, it has been in compliance with its NPDES permit limitations since November 1987, and thus Atlantic's action is moot. However, Atlantic contends that Universal's assertion is untrue and that Universal continuously violated its permit throughout the first seven months of 1988. Atlantic insists that Universal has not met its heavy burden of guaranteeing that no future permit violations would occur and further argues that even if Universal could convince the court that no future permit violations will occur, thereby rendering Atlantic's claim for injunctive relief moot, Atlantic's claim for civil penalties would still be "alive."

Both parties cite *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), in support of their respective positions. In *Gwaltney* the Supreme Court indicated that the issue of a permit violation may become moot if a defendant

demonstrate[s] that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to re-

cur. Mootness doctrine thus protects defendants from the maintenance of suit under the Clean [Water] Act based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable protestations of repentance and reform.

108 S.Ct. at 386 (emphasis in original; quotation marks and citations omitted). As Universal notes, *Gwaltney* clearly stands for the proposition that citizen suits cannot be maintained for wholly past violations of the Act. Fortunately, *Gwaltney's* subsequent history provides guidance for determining when citizen suits are not mooted by a defendant's post-complaint compliance with permit limitations.

Following the Supreme Court's decision and remand to the Fourth Circuit, the Fourth Circuit remanded *Gwaltney* to the district court for further proceedings. 844 F.2d 170 (4th Cir.1988). Upon remand, the district court found that plaintiffs had established ongoing violations of defendant's permit sufficient to invoke subject matter jurisdiction, and reinstated the penalty which had originally been imposed. 688 F.Supp. 1078 (E.D.Va.1988). Defendant then appealed to the Fourth Circuit and argued that the action was moot because defendant had not violated its permit after the litigation had commenced. The Fourth Circuit rejected this argument and stated:

> In our view, the penalty factor keeps the controversy alive between plaintiffs and defendants in a citizen's suit, even though the defendant has come into compliance and even though the ultimate judicial remedy is imposition of civil penalties assessed for past acts of pollution. . . .
>
> A similar rationale governs our consideration of putative mootness arguably brought on by corrective action after a § 1365 citizen suit has been initiated. When the Supreme Court concluded in its *Gwaltney* decision that § 1365 permits citizens' actions against polluters while there are ongoing violations, the court effectively approved the assessment of penalties based on past violations (the only possible basis for assessing a penalty). Assuming, then, proof of an ongoing violation, a citizen action, like a government action, cannot become moot once there is assessment of civil penalties, so long as the penalties are for past violations that were part of or which contiguously preceded the ongoing violations.

*Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 890 F.2d 690, 696–97 (4th Cir.1989).

The Fourth Circuit found that, to the extent plaintiff had established that there were ongoing violations at the time the litigation was commenced, the case was not moot even though a defendant had subsequently come into compliance with its permit limitations.

A similar holding was made by the Eleventh Circuit in *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128 (11th Cir.1990). In *Tyson* the district court had held that the Supreme Court's decision in *Gwaltney* required it to dismiss as moot a citizen suit seeking relief for violations which, although occurring before and after filing of suit, had ceased at the time of defendant's motion for summary judgment. The Eleventh Circuit, however, reversed and remanded, holding that for purposes of assessing a plaintiff's allegations of ongoing violations, the court must always look to the date the complaint was filed. As Atlantic had shown the existence of ongoing violations, by way of DMR's filed by Tyson, the court further held that Atlantic had established liability under the Clean Water Act and was entitled to seek civil penalties for Tyson's noncompliance with its NPDES permit.

Atlantic argues that in the instant case the *Gwaltney* mootness analysis, insofar as it held that citizen suits cannot be maintained for past violations, is factually inapplicable because Universal has continued to be out of compliance over an extended period of time after suit had been commenced. Atlantic points out that Universal's DMRs show that, at the time suit was commenced, and continuing thereafter, there were and

continued to be violations of Universal's permit limitations for various pollutants. Therefore, Atlantic concludes, Universal has not met its burden of showing to an *absolute certainty* that it will not violate its NPDES permit in the future.

In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In support of its motion for summary judgment Universal has submitted an affidavit of Edward P. Guindon, a chemical engineer who was employed as Universal's certified wastewater treatment operator. In his affidavit Mr. Guindon states that Universal's DMRs reflect that there were no permit exceedences in December of 1987, but there were four incidents of mass loading exceedences in January of 1988, and there were two incidents of mass loading exceedences in February of 1988. The Guindon Affidavit further states that from March of 1988 through August of 1988 Universal was in complete compliance with its NPDES permit. In its brief in opposition of Universal's motion for summary judgment, Atlantic contends that the Guindon Affidavit is inaccurate in several respects. In Exhibit D of its brief Atlantic sets forth these inaccuracies showing that Universal has exceeded the limitations of its NPDES permit numerous times during the time period of July 1987 to July 1988. At oral arguments held on August 23, 1989, Universal argued that prior to September 1, 1988, the date the Final Consent Order specified that Universal was to be in compliance with its NPDES permit, Universal was not subject to any mass loading requirements and therefore could not be in violation of any mass loading requirements. In response to Universal's argument, Atlantic noted that Universal has reported violations of its NPDES permit in March and April of 1989, as well as in September, October and November of 1988.

In light of the foregoing evidence. it is abundantly clear that Universal has not met its "heavy burden" of showing that it will not violate its permit in the future. Considering Universal's DMRs for 1988 and 1989 it is questionable that Universal will ever be in compliance with its permit. Consequently, the court finds that Atlantic's action is not moot.

### *Constitutionality of Section 505 of the Clean Water Act*

■ Universal's last argument in support of its motion for summary judgment is that § 505 of the Clean Water Act, 33 U.S.C. § 1365, which authorizes civil penalty enforcement by private citizens, is unconstitutional. Universal contends that this provision violates both the separation of powers doctrine and the appointments clause of the United States Constitution. Universal cites *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), in support of its argument that institution of a lawsuit to enforce federal law is an executive function, and since the citizen suit provisions allow persons who are not officers of the United States to enforce the Clean Water Act through private litigation, the provisions contravene established separation of powers principles. Universal's reasoning is flawed for two reasons. First, *Buckley* and *Bowsher* both address separation of powers vis-a-vis Congress and the Executive, not private persons and the Executive. Second, Universal ignores the principal that Congress creates statutory rights and obligations, and it determines who may enforce them and in what manner.

*Buckley* involved, *inter alia*, a constitutional challenge to the composition of the Federal Election Commission. The Commission was established to administer and enforce the Federal Election Campaign Act. That act granted the Commission broad investigatory, rulemaking, and enforcement powers. Two members of the Commission were also members of Congress, four Commission members were appointed by Congress, and the remaining two were appointed by the President. Because four of the six voting members were

appointed by and obligated to Congress, the Supreme Court ruled that certain provisions of the Act violated the separation of powers doctrine:

> We hold that these provisions of the Act, vesting in the Commission primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights, violate Art. II, § 2, cl. 2, of the Constitution. Such functions may be discharged only by persons who are "Officers of the United States" within the language of that section.

*Buckley v. Valeo,* 96 S.Ct. at 692.

Throughout its opinion, the Supreme Court stressed the fact that the separation of powers doctrine prohibited one branch from intruding into the sphere of another and struck down certain provisions of the Federal Election Campaign Act because the provisions allowed Congress to exercise executive authority by appointing persons who would enforce the laws. Congress may not "vest in itself ... the authority to appoint officers of the United States when the Appointments Clause by clear implication prohibits it from doing so." *Id.* at 690.

Clearly *Buckley v. Valeo* was concerned with Congress expanding its powers at the expense of the Executive Branch. The opinion does not stand for the proposition, as Universal would have the court believe, that private persons may not enforce any federal laws simply because they are not "Officers of the United States" appointed in accordance with Article II of the Constitution.

Similarly, *Bowsher v. Synar* does not support Universal's argument. In *Bowsher,* the Supreme court struck down a provision of the Gramm–Rudmann–Hollings Act which provided that the Comptroller General would exercise necessary budget reductions:

> By placing the responsibility for execution of the Balanced Budget and Emergency Deficit Control Act in the hands of an officer who is subject to removal only by itself, Congress in effect has retained control over the execution of the Act and has intruded into the executive function.

The Constitution does not permit such intrusion.

*Bowsher v. Synar,* 106 S.Ct. at 3192.

The Supreme Court has made it clear that executive powers may not be entrusted to an officer who is subservient to or may be controlled by Congress, as was the Comptroller General. Private litigants, however, are not controlled by Congress. Consequently, *Bowsher* does not support Universal's contentions. Because § 505 of the Clean Water Act, 33 U.S.C. § 1365, does not expand Congress' power at the expense of the Executive Branch, and because Congress may determine who will enforce the statutory rights and obligations that it creates, the citizen suit provision of the Clean Water Act does not violate the constitutional principle of separation of powers. Accordingly, Universal's motion for summary judgment must be denied.

### Atlantic's Motion for Partial Summary Judgment

■ Atlantic argues that it is entitled to partial summary judgment on the issue of liability of Universal for numerous violations of the Clean Water Act. Atlantic asserts that the uncontroverted facts demonstrate that defendant, by its own admission, has operated its facility in violation of the terms and conditions of its NPDES permit. Atlantic concludes that there is no genuine issue of material fact concerning defendant's liability for violation of its NPDES permit and thus of the Clean Water Act.

As noted earlier, the Clean Water Act requires any permit issued under the NPDES program to: (a) include effluent limitations based on the effluent limitations established pursuant to § 1311(b) for the permit holder's industrial category, upon such limitations as the Administrator deems necessary if he has not promulgated effluent limitations for the permit holder's industrial category, or upon the State's requirements or any applicable water quality standards promulgated pursuant to §§ 1312 and 1313 of the Clean Water Act; (b) require the permit holder to be in compliance with the effluent limitations in the

permit by a specified date; and (c) require the permit holder to monitor its discharges and report the results to the EPA or the State in DMRs. If the permit holder complies with all of the permit provisions, it is deemed to be in compliance with § 1311 for purposes of both the EPA and citizen enforcement actions. If it fails to comply with its permit, it is deemed to be in violation.

Atlantic notes that Universal has admitted in official reports that its discharges have exceeded the effluent limitations in its NPDES permit. Universal, in fact, does not deny that it has violated its NPDES permit or that it has violated the Clean Water Act. At oral arguments held on August 23, 1989, Universal conceded that, but for the arguments raised in its motion for summary judgment, Atlantic is entitled to summary judgment on the issue of liability. Consequently, as the court has already determined that Atlantic has properly brought this action against Universal and Universal's motion for summary judgment must therefore be denied, Atlantic's motion for partial summary judgment must be granted.

### Conclusion

For the foregoing reasons defendant's motion for summary judgment is hereby DENIED and plaintiff's motion for partial summary judgment is hereby GRANTED.