**CALIFORNIA SPORTFISHING PROTECTION ALLIANCE,**
Plaintiff,

v.

**CITY OF WEST SACRAMENTO,**
Defendant.

Civ. No. S–94–0947–DFL–GGH.

United States District Court,
E.D. California.

Oct. 24, 1995.

---

Joseph Tabacco, Alan Beaven, Stamell, Tabacco & Schager, San Francisco, CA, for plaintiff.

Andrew Pollak, Thomas Keeling, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, for defendant.

## AMENDED MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

This is an action under the citizen suit provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.* The subject of the suit is a wastewater treatment plant operated by defendant, the City of West Sacramento, under a permit issued by the State Regional Water Quality Control Board for the Central Valley Region (the "Board").[1] Plaintiff California Sportfishing Protection Alliance ("CSPA"), alleges that since June 1989 the plant has been operated in violation of its permit and that the violations are continuing. Specifically, the complaint alleges that the plant has exceeded effluent limitations and circumvented reporting and monitoring requirements in the permit. As to effluent violations, the complaint alleges that the plant's coliform count exceeded the permitted maximum on two days in 1993 and thirteen days in 1994. The complaint also alleges more generally that each spring through late summer the plant "is incapable of meeting the effluent limitations" in its permit. As to reporting and monitoring violations, the complaint charges that the City failed to report violations of the effluent limits for chlorine,

---

1. The Clean Water Act addresses the discharge of all pollutants into navigable waters, and regulates the City's plant through a National Pollutant Discharge Elimination System (NPDES) permit. 33 U.S.C. §§ 1311(a), 1362(12), 1342. NPDES permits typically specify particular effluent limitations, including permissible concentrations of indicated pollutants, and require that the discharger monitor its effluent and submit reports disclosing the results. 33 U.S.C. §§ 1131, 1342(a)(2). In California, the U.S. Environmental Protection Agency ("EPA") has delegated to State agencies the authority to issue NPDES permits. *E.P.A. v. Cal. ex rel. St. Water Res. Control Bd.,* 426 U.S. 200, 209, 96 S.Ct. 2022, 2026–27, 48 L.Ed.2d 578 (1976). The State operates under the Porter–Cologne Water Quality Control Act, California Water Code sections 13000 *et seq.,* which establishes the Regional Water Control Boards that issue and monitor NPDES permits.

coliform and suspended solids and manipulated samples to conceal such violations.[2] CSPA seeks injunctive relief and civil penalties.

The administrative backdrop to the complaint is important to the pending motions. The complaint, filed June 14, 1994, follows in time two enforcement actions by the Board that address many of the same violations that are the subject of CSPA's suit.[3] On September 21, 1993, the Board initiated an administrative civil liability complaint, ACL 93–503, which addressed numerous effluent violations. The City eventually agreed to pay a total of $60,000 in fines to resolve the complaint. On March 24, 1994, the Board began another enforcement action against the City by issuing a notice of violation for effluent and monitoring violations. The Board eventually filed another administrative civil liability complaint, ACL 94–517, against the City on June 8, 1994. This administrative complaint was settled in the following month by the City's payment of $250,000.

The City now moves to dismiss and raises two difficult questions concerning the citizen suit provision in the Clean Water Act, 33 U.S.C. §§ 1319(g)(6) and 1365. The first question is whether CSPA's notice to the City, the EPA, and the Board was sufficiently specific to comply with the notice prereq-

uisite at 33 U.S.C. § 1365(b) and the EPA's implementing regulation at 40 C.F.R. § 135.3(a). If plaintiff has provided sufficient notice as to any of its claims, the court must then consider the second issue as to when a state enforcement action precludes citizen suits for the same ongoing problems.

## I.

■ The citizen suit provision of the Clean Water Act requires a citizen plaintiff to give sixty days' notice of the alleged violation to the EPA, the State and the violator prior to bringing suit.[4] 33 U.S.C. § 1365(b). This provision is mandatory and a failure to give notice as required will lead to dismissal. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989). On April 14, 1994, plaintiff sent notice to the City of its intention to bring suit against it under the Clean Water Act. The critical paragraph gives notice as follows:

> For the previous five years on hundreds of occasions you have violated your NPDES permit. Further, you have consistently misreported and/or failed to report the results of your testings. As recent examples, you violated your NPDES permit on January 31, February 2, and February 10 with respect to coliform, chlorine, BOD and total suspended solids.[5]

2. The complaint particularly focuses on the City's alleged manipulation of chlorine samples, for example, by adding a chemical to dissipate the chlorine or by pretesting and discarding samples that failed the limitation for chlorine residue. The complaint also alleges that "[a]t times prior to June 1, 1993, the City increased its chlorine dose prior to collecting the coliform sample."

3. There have been other enforcement actions as well. During the 1980's, the City's plant apparently suffered from inadequate pretreatment of discharges and violations of effluent limitations every spring and summer. The Regional Board responded with Cease and Desist Order No. 85–269 in 1985, and imposed $30,000 in penalties in Administrative Civil Liability Complaint No. 89–513 in 1989. Furthermore, in November 1991 the Board adopted Cease and Desist Order No. 91–201 for chronic violations of effluent limitations for numerous pollutants.

4. Section 1365(b)(1)(A) provides in pertinent part that "No action may be commenced ... prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs,

and (iii) to any alleged violator of the standard, limitation, or order." Section 1365(b)(1)(B) bars a citizen suit if the "Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation or order."

5. The full text of CSPA's letter is printed below:

We act for the California Sportfishing Protection Alliance, P.O. Box. 357, Quincy, CA 95971, telephone: (916) 661–0997.

The reports filed by the City of West Sacramento's Wastewater Treatment Plant (WWTP) reveal ongoing violations of your NPDES permit.

On March 24, 1994, the California Regional Water Quality Control Board notified you of chlorine violations, non-reporting, that bioassay samples were "scrubbed," that coliform organisms exceeded the effluent limitation, and that solid waste were observed over the Sacramento River Bank.

For the previous five years on hundreds of occasions you have violated your NPDES permit. Further, you have consistently misreported

The question presented is whether this notice, couched in such general terms, is sufficiently detailed to satisfy the EPA regulations prescribing the content of such a notice.

Section 1365 of the CWA provides that "[n]otice under this subsection shall be given in such manner as the [EPA] Administrator shall prescribe by regulation." 33 U.S.C. § 1365(b). The EPA has issued a regulation on notice which requires as follows:

> Notice regarding an alleged violation of an effluent standard or limitation of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a).

The Third and Ninth Circuits have recently interpreted different parts of this regulation. In *Washington Trout v. McCain Foods*, 45 F.3d 1351, 1352 (9th Cir.1995), the citizens' letter failed to provide the name, address or telephone number for two of the organizations that eventually became the only plaintiffs in the case. As a result, the court held that dismissal of the suit for inadequate notice was proper. *Id.* at 1354–55.[6] In adopting a strict construction of the regulatory requirements, the court sought guidance from *Hallstrom v. Tillamook County*, 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989). In *Hallstrom*, the plaintiffs gave notice to the alleged violator but had failed to give notice to the EPA or State prior to bringing an action in federal court against the alleged violator under the Resource Conservation and Recovery Act of 1976 (RCRA).

The Supreme Court held that compliance with the citizen suit notice provision in RCRA, which is similar to the notice requirement in the Clean Water Act, was a mandatory precondition to suit and was not amenable to "a flexible or pragmatic construction" depending on the circumstances of a particular case. *Id.* at 26, 110 S.Ct. at 309. The Court found that strict adherence to the notice requirements furthered the legislative purpose:

> [T]he legislative history indicates an intent to strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits. Requiring citizens to comply with the notice and delay requirements serves this congressional goal in two ways. First, notice allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits. In many cases, an agency may be able to compel compliance through administrative action, thus eliminating the need for any access to the courts. Second, notice gives the alleged violator "an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit."

*Id.* at 29, 110 S.Ct. at 310 (citations omitted). Applying this reasoning in *Washington Trout*, the court found that by failing to identify in the notice the names of all plaintiffs, the notice did not place the agencies in a position to reach a negotiated settlement during the notice period: "[B]ecause neither the EPA nor McCain [the defendant industry] knew other plaintiffs were involved, they were not in a position to negotiate with plaintiffs or seek an administrative remedy." *Id.* at 1354.

In *Public Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239 (3rd Cir.1995), the

---

and/or failed to report the results of your testings. As recent examples, you violated your NPDES permit on January 31, February 2, and February 10 with respect to coliform, chlorine, BOD and total suspended solids. We believe that unless you are enjoined by the court, you will continue to act in violation of the prescribed limits.

We are hereby giving you notice pursuant to Section 1365 of the Clean Water Act Title 33

United States Code that we intend to bring suit in the Federal Court Sacramento to compel compliance with the Clean Water Act and for penalties to be assessed against you.

**6.** The court explicitly declined to address defendants' alternative argument that plaintiffs had failed to indicate "the date or dates of such violation." *Id.* at 1352, n. 2.

Third Circuit examined portions of the regulation which are also at issue in this case but took a rather looser approach to the regulation than that of the Ninth Circuit in *Washington Trout.* In *Hercules* the plaintiffs' notice letter identified sixty-eight discharge violations from April 1985 through February 1989. *Id.* at 1242. The complaint, however, included some eighty-seven alleged discharge violations, and the bulk of the additional allegations concerned violations that had occurred prior to the notice. *Id.* at 1243. Later in the litigation, plaintiffs added more discharge violations and also several hundred monitoring, reporting, and record keeping violations. *Id.* The district court granted judgment for defendant as to all pre-complaint discharge violations that were not listed in the notice letter and as to all monitoring, reporting, and record keeping violations because the notice letter had made no mention of those kinds of violation. *Id.* at 1244.

In rejecting the district court's holding that the regulation required the notice to "identify every pre-complaint date on which there was an excess discharge of a designated pollutant" the court held:

> We read the regulation to require just what it says: that the citizen provide enough information to enable the recipient ... to identify the specific effluent discharge limitation which has been violated, including the parameter violated, the date of the violation, the outfall at which it occurred, and the person or persons involved.

*Id.* at 1248. The court noted that the agencies were in just as good or better position than a citizen plaintiff to determine violations of a like nature, and that to require each violation to be specifically identified would place an undue impediment before citizen suits. *Id.* at 1248–49.

From this perspective, the court concluded that a notice that identifies an excessive discharge also gives notice of a monitoring violation for that effluent because "in investigating one aspect of a parameter violation, such as a discharge, the other aspects of that violation, for instance monitoring, reporting, and record keeping requirements for that parameter, will of necessity come under scru-

tiny." 50 F.3d at 1248. Further, the court found that it was not necessary for the notice to include each individual violation of a specific discharge limitation:

> For example, if a permit holder has discharged pollutant "x" in excess of the permitted effluent limit five times in a month but the citizen has learned only of four violations, the citizen will give notice of the four violations of which the citizen then has knowledge but should be able to include the fifth violation in the suit when it is discovered.

*Id.* In sum, the court held that "a notice letter which includes a list of discharge violations, by parameter, provides sufficient information for the recipients of the notice to identify violations of the same type (same parameter, same outfall) occurring during and after the period covered by the notice letter." *Id.* at 1250.

*Washington Trout* and *Hercules* address different portions of the regulation and thus are not in direct conflict. Nonetheless, the reasoning and emphasis in *Washington Trout* and *Hercules* are rather different. Whereas the Ninth Circuit stresses the role of the notice in permitting the relevant agency to take its own action, and so concludes that the regulation must be strictly adhered to, the Third Circuit emphasizes that the regulation itself only requires sufficient notice "to permit the recipient to identify" the requisite information concerning a violation. Applying the Third Circuit approach to the situation in *Washington Trout,* possibly leads to a different outcome because the agency, upon inquiry of the group identified in the notice letter, might well have been able to determine if other citizen groups joined in the notice and should be included in any settlement discussions leading to a pre-litigation resolution.

Moreover, although paying lip service to the role that notice plays in permitting the relevant agency and the alleged violator to head off a citizen suit by negotiated settlement, compliance by the violator or enforcement action, the *Hercules* opinion does not interpret the language of the regulation with this in mind. The notice provision gives just sixty days to the agency to attempt to decide

whether the allegations have merit and whether to file its own action. If the agency chooses to do so, it may file suit that would preclude a citizen action. 28 U.S.C. § 1365(b)(1)(B). Alternatively, the agency may attempt to mediate the dispute or begin its own administrative action. The agency may already have begun an enforcement action, concerning the same alleged violations, and it must then consider whether the citizen notice of violations covers the same violations—and so may be precluded under 33 U.S.C. § 1319(g)—or alleges new violations. Presumably in considering their various options, both the agency and the alleged violator will wish to estimate the violator's potential exposure to civil penalties. The civil penalty provision is pegged to each day of violation, up to $25,000 per day, and therefore precise information as to days of violation will be needed to makes this estimation. 33 U.S.C. § 1319(d).

When the notice is precise, sixty days is none too much time for an agency to resolve on a course of action and take necessary steps whether to settle the matter or bring an enforcement action. But if the notice is imprecise, and requires the agency to develop on its own what the scope of the alleged violations are, then it becomes entirely impractical for the notice provision to fulfill its purpose in such a short time period.

The language of the regulation does not suggest that the notice may be good enough if it generally orients the agency or violator as to the type of violation. While the *Hercules* court emphasizes that "the notice shall be sufficient to permit the recipient to identify" the specific standard, activity, responsible person, location, and date at issue, it fails to note that from this information the recipient must be able to determine the "specific standard *alleged* to have been violated," "the activity *alleged* to constitute a violation," the location of the "*alleged* violation," and the date or dates "of such violation." Thus, the

recipient of the notice must understand from the notice what the citizen *is alleging*—not what the citizen could allege if the citizen knew more or cared about other possible transgressions.

▮ In short, the strict approach taken by the Ninth Circuit appears most consistent with the purpose of the notice provision, the language of the regulation, and the structure of the statute. Under such an approach it will not suffice to give notice of a monitoring violation by giving notice of an effluent violation.[7] The two violations are distinct and plaintiff must give notice of each. It is not enough that the agency could conclude that the effluent violations also led to monitoring or record keeping violations. Furthermore, the date or dates of the violation must be stated with some specificity. Ideally plaintiff will identify the precise date. But at the least plaintiff should give a range as to date that is reasonably limited. In *Hercules* the court considered that if a plaintiff gave notice of four violations a fifth violation in the same time period could be deemed within the notice. But in *Hercules* the plaintiff gave very detailed notice of many separate incidents on identified days. The court did not address whether more open-ended information on time would suffice or what it meant by "the period covered by the notice letter."

▮ Here CSPA gave notice that on January 31, February 2, and February 10, 1994, the plant violated the permits as to limits for coliform, chlorine, biochemical oxygen demand, and total suspended solids. This notice complies with the regulation.

▮ The notice also refers to a notification to the City by the Board in which the Board identifies other violations: "On March 24, 1994, the California Regional Water Quality Control Board notified you of chlorine violations, non-reporting, that bioassay samples were 'scrubbed,' that uniform organisms exceeded the effluent limitation, and that sol-

---

7. The position stated in text is the same as that taken by the United States in the amicus brief it submitted in *Hercules*. As the United States discusses, if the citizen plaintiff develops reporting violations in the course of discovery there is no reason why the plaintiff cannot give the sixty day notice and then seek to amend the complaint to

add the new allegations. The United States filed its brief in response to the Third Circuit's request for EPA's views on 40 C.F.R. § 135, a regulation EPA had drafted. United States *Hercules* amicus brief at 2. The court accepts plaintiff's request to take judicial notice of the brief.

id waste were observed over the Sacramento River Bank." This portion of the notice letter does not suffice because there is no time given as to the violation, it is not clear in some instances what the violation is—e.g. "non-reporting" of what?—and it is not clear whether CSPA makes or adopts these allegations. Finally, the notice states: "For the previous five years on hundreds of occasions you have violated your NPDES permit. Further, you have consistently misreported and/or failed to report the results of your testings." This portion of the notice letter fails to comply with the regulation because it is vague as to which portions of the permit have been violated and which test results were not reported or were misreported. "The previous five years on hundreds of occasions" does not give sufficient notice of the date or dates on which the violations are alleged to have occurred.

■ It remains to examine the complaint in the light of the above discussion. Paragraph 16 of the complaint alleges that the City was in violation of the permit during the period from June 14, 1989 to June 1, 1993, and that on June 1, 1993, the Board advised the City that its sampling was not adequate. These allegations are not fairly included within that portion of the notice that is adequate. Paragraph 17 alleges coliform limitations violations on April 29, 1993 and May 10, 1993. These allegations are many months prior to the three dates in late January and early February of 1994 listed in the notice. Thus, the allegation in paragraph 17 is not within the terms of the notice letter.

Paragraphs 18, 20, 21, 22, 23, 24, 25 and 26 allege various monitoring and reporting violations. As discussed above, these types of violations are not comprised within the notice letter. Paragraph 19 alleges that "each spring through late summer" the plant was incapable of meeting effluent limitations in the permit. This allegation, vague as it is, was not included within the notice letter. Similarly, the allegation in paragraph 28 that the "City has violated and continues to violate the permit limitations" only may go forward as to the three dates specified in the notice letter in January and February 1994.

■ Finally, paragraph 27 alleges permit violations for thirteen dates. All of the dates are after the notice letter. One of the dates—May 31, 1994—precedes the complaint. The remainder all post-date the complaint. Assuming that these violations concern excessive coliform, chlorine, BOD or total suspended solids these allegations may go forward. The parties agree that new, post-complaint violations of the same sort as those listed in the complaint may be added to the complaint on file by amendment without an additional notice letter. (Def's. Mem. in Resp. to Order Dated 2/10/95 at 8, n. 7; Pl's. Second Supp. Mem. at 6.) The agreement of the parties on this point is in accord with the Supreme Court's opinion in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), in which the Court held that citizen suits are only authorized for ongoing violations and that the complaint must allege that the violations are ongoing. Since there must always be new violations, sufficient notice could never be given if a new notice were required for each new violation. Although the City argues that the May 31, 1994, allegation should be treated differently as antedating the complaint, there does not seem to be a reason to distinguish between continuing violations after notice but before the complaint is filed and continuing violations accruing after the complaint. The same difficulty appears: if the violations are ongoing, as they must be to bring suit, then new violations must occur during the sixty day waiting period such that no comprehensive complaint could ever be filed. Moreover, the May 31, 1994, allegation is fairly close in time to the February 10, 1994 allegation specified in the notice letter.

In sum, plaintiff may proceed on the allegations in paragraph 27, assuming that these allegations relate to effluent violations for the effluents listed in the notice letter, and may go forward as to the allegations as to the three dates specifically listed in the notice letter and comprised within the general allegation in paragraph 28. The remaining allegations must be dismissed.

## II.

Since CSPA did provide sufficient notice for some of its claims, the court must consider the City's second major argument for dismissing plaintiff's claims. West Sacramento contends that CSPA's suit is precluded by the Regional Board's diligent prosecution of the City under ACL 93–503 and ACL 94–517. These preclusion claims turn on a close statutory analysis of 33 U.S.C. § 1319(g)(6).

### A.

Created by the 1987 amendments to the Clean Water Act, section § 1319(g) authorizes administrative penalty actions. In § 1319(g)(6), Congress has outlined the precise conditions when federal or state administrative actions bar other kinds of enforcement actions, including citizen suits. In § 1319(g)(6)(A), titled "limitations on actions under other sections," the Act bars citizen suits as to "any violation":

> (i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection,

> (ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or

> (iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be.

Because subsection (A)(i) only concerns federal enforcement actions, it is not relevant to this case.[8] The other two subsections, however, are apposite. For the claims covered by ACL 93–503, the state enforcement agency had issued a final civil penalty complaint by September 1993 well before the time CSPA filed its notice of intent to sue in

April 1994.[9] Thus, as to ACL 93–503 the relevant portion of the statute is § 1319(g)(6)(A)(iii). The State's issuance of a penalty under an administrative civil liability complaint is a final order not subject to judicial review, and the City did pay the fine. The only remaining question then is whether the penalty was assessed under "comparable State law."

For claims covered by ACL 94–517, the issue is somewhat more complex. Unlike ACL 93–503, the Board had not issued a final order and the penalty paid by the time of the citizen suit. The penalty was paid by the City on July 8, 1994, just weeks after the filing of this complaint on June 14, 1994. Here § 1319(g)(6)(A)(ii) applies because the State had commenced but had not completed a prosecution under state law by the time CSPA filed suit on June 14, 1994. For subsection (ii) to preclude suit, ACL 94–517 must constitute diligent prosecution. Plaintiff does not argue to the contrary given that the Board imposed $250,000 in civil penalties and required improvements estimated to cost an additional $800,000. Accordingly, § 1319(g)(6)(A)(ii) would bar suit if ACL 94–517 represented prosecution under a state law "comparable" to § 1319(g), precisely the same issue as applied to ACL 93–503 above.

 However, there is a further complication for claims covered by ACL 94–517. Subsection (B) of § 1319(g)(6) lifts the bar to citizen suits when certain conditions are met. In the provisions relevant here, subsection (B) allows citizen suits to proceed despite an enforcement action where:

> (i) a civil action under section 1365(a)(1) of this title has been filed prior to commencement of an action under this subsection, or

> (ii) notice of an alleged violation of section 1365(a)(1) of this title has been given ... prior to commencement of an action under this subsection

currently pending subject to ACL 93–503. The court addresses the preclusive effect of ACL 93–503 as an alternative holding for the dismissal of claims for the same violations and to give guidance in the event plaintiff seeks to give further notice and amend the complaint in the future.

---

8. The terms "Administrator" and "Secretary" refer to the Administrator of EPA and the Secretary of the Army.

9. In the preceding section, the court found that proper notice has not been given for claims from 1993 and before. Thus, there are no claims

(emphasis added). CSPA argues that it may take advantage of subsection (B)(ii) because it filed its notice of violation before the Board issued the administrative liability complaint.

The main impediment to CSPA's argument is that the language of subsection (B), lifting the bar that otherwise applies in subsection (A), simply has no application to state enforcement actions. Thus, whereas subsection (A) explicitly bars citizen suits when the state is prosecuting a penalty action or has finished such a prosecution and the penalty paid, subsection (B) only addresses the lifting of the bar in the circumstance of a federal administrative penalty action by the Administrator of EPA or Secretary of the Army. This is because the bar to suit is partially lifted only for "an action under this subsection," a reference to § 1319(g) which applies only to administrative penalty actions brought by the Administrator and the Secretary. By contrast, a state administrative action is not brought under subsection 1319(g) but under "a State law comparable to this subsection."

CSPA argues that the court should treat this contrast in treatment of federal and state proceedings as an oversight, an unintended gap that may be addressed by adding the language "or an action under a State law comparable to this subsection" in the appropriate places in subsection (B). Plaintiff correctly observes that all of the numerous courts construing section 1319(g)(6)(B) to date have simply assumed that it refers to state as well as federal actions. But these courts have done so without discussion and apparently without consideration of the wording "under this subsection" in the language of the statute.[10]

■ The court declines the invitation to re-write the statute. The plain language of a statute is conclusive "unless 1) the statutory language is unclear, 2) the plain meaning of

the words is at variance with the policy of the statute as a whole, or 3) a clearly expressed legislative intent exists contrary to the language of the statute." *Columbia Pictures v. Professional Real Estate Inv.*, 866 F.2d 278, 280 n. 4 (9th Cir.1989). Furthermore, the Ninth Circuit has cautioned against relying on "general arguments about congressional intent" alone to depart from the plain language that Congress used in addressing citizen suits under the Clean Water Act. *Washington Public Interest Research Group v. Pendleton Woolen Mills*, 11 F.3d 883, 886 (9th Cir.1993).

In this case, the parties agree that "under this subsection" clearly refers to section 1319(g). Plaintiff, however, contends that this plain meaning conflicts with the policy of the statute as a whole. CSPA argues that the statute's words "lead to the bizarre result that a state's power to preempt a federal court citizen suit would be *greater* than EPA's ability to preempt such a suit." (Emphasis in original.) But in a federal system, distinctions by Congress between state and federal administrative processes are not at all bizarre but should be expected. Congress' stated policy in the Clean Water Act is "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(b). By limiting the citizen suit provision in instances when the state is diligently prosecuting, Congress may purposely have given greater autonomy to state prosecutions than to federal prosecutions in order to preserve and protect the states' administrative processes from undue interference from the federal scheme. Similarly, Congress may not have wished to usurp the states' ability to define the scope of citizen participation once the state has begun an enforcement action.

10. *See Proffitt v. Municipal Auth. of Borough of Morrisville*, 716 F.Supp. 837, 842 (E.D.Pa.1989), aff'd, 897 F.2d 523 (3rd Cir.1990); *Public Interest Research Group of New Jersey, Inc. v. Elf Atochem North America, Inc.*, 817 F.Supp. 1164, 1172 (D.N.J.1993); *Massachusetts Public Interest Research Group, Inc. v. ICI Americas, Inc.*, 777 F.Supp. 1032, 1036 (D.Mass.1991); *Public Interest Research Group of New Jersey, Inc. v. GAF Corp.*, 770 F.Supp. 943, 949–950 (D.N.J.1991); *Arkansas Wildlife Federation v. ICI Americas, Inc.*, 29 F.3d 376, 382 (8th Cir.1994); *Sierra Club v. Colorado Refining Co.*, 852 F.Supp. 1476, 1484 (D.Colo.1994); *Public Interest Research Group v. Yates Industries*, 757 F.Supp. 438, 444, reconsideration denied in part and granted in part on other grounds, 790 F.Supp. 511 (D.N.J.1991).

Finally, there is an inadequate basis for finding that the statutory language is at odds with a clearly expressed legislative intent. The legislative history of this subsection is inconclusive.[11] The House Bill provided only that "if the Administrator or State has commenced and is diligently pursuing the assessment of a civil penalty under section 309(g)" a citizen suit would be barred.[12] H.R. 8 at 70 (99th Cong., 1st Sess.) (1985). The proposed Senate Bill is much closer to the final version but includes no reference to actions by the state either in the language barring citizen suits or in the language lifting the bar depending on the timing of the suit.[13] S. 1128 at 22–23 (99th Cong., 1st Sess.) (1985). The final version of the legislation emerged from the conference. While similar to the Senate Bill, the final version is restructured into two subsections and includes a bar on civil suits when there are pending or completed state enforcement actions. In adding language barring citizen suits when state actions are pending or completed, the conference carefully added the critical language "under a State law comparable to this subsection" in all appropriate places. Perhaps CSPA is correct that the conference simply erred in not adding similar language to subsection

(B), but it is equally possible that the conference intentionally left out the language. There is no express discussion in any of the reports that addresses the intent of Congress, whether to include or exclude state enforcement actions from subsection (B). Given that the language of § 1319(g)(6) is not unclear and is rational, Congress must be the one to amend it, if it so desires, not this court.

### B.

■■■ CSPA also argues that the bar in § 1319(g)(6)(A) does not apply because the Board was not proceeding under a "State law comparable to" § 1319(g). There is some disagreement in the case law as to the meaning of the phrase "comparable to this subsection," with some courts loosely comparing the state scheme to the federal and other courts requiring that the state penalty provision must closely parallel the federal approach by including penalty amounts, public participation, and judicial review. *Compare Arkansas Wildlife Federation v. ICI Americas, Inc.,* 29 F.3d 376, 381 (8th Cir.1994), *with Atlantic States Legal Foundation v. Universal Tool,* 735 F.Supp. 1404, 1415–6 (N.D.Ind.

**11.** Congress overrode President Reagan's veto to pass the 1987 amendments to the Clean Water Act in February 1987. An identical set of amendments to the Clean Water Act had passed in 1986, which also had been vetoed by President Reagan. The conference committee that put together the final version of the bill issued its report in October 1986. *House Conference Report Amending the Clean Water Act,* No. 1004 (99th Cong., 2nd Sess. (1986)), 132 Cong.Rec. 31577. The 1986 conference committee report is authoritative on the legislative intent for the 1987 bill, because there were no changes whatsoever before the bill passed within the first month of the 1987 legislative session. The conference product reconciled bills that had passed the individual chambers in 1985. H.R. 8 (99th Cong., 1st Sess.) (1985); S. 1128 (99th Cong., 1st Sess.) (1985); *see also Report of the House Committee on Public Works and Transportation on the Water Quality Renewal Act of 1985,* No. 189 (99th Cong., 1st Sess. (1985)); *Report of the Senate Committee on Environment and Public Works on Clean Water Act Amendments of 1985,* No. 50 (99th Cong., 1st Sess. (1985)).

**12.** Perhaps plaintiff could find some support for its position in the inartful language of this section which wrongly assumes that a state could bring a penalty action under subsection 1319(g).

But any argument based on this language is weakened by the fact that the error is very deliberately corrected in the final version of the section which always refers to state actions as under "comparable State law."

**13.** The pertinent language from the Senate Bill provides:

any violation with respect to which the Administrator or the Secretary of the Army has commenced and is diligently prosecuting an action under this subsection, or for which the Administrator or the Secretary of the Army has issued a final order not subject to further judicial review and the violator paid a penalty assessed under this subsection, shall not be the subject of a civil penalty action under … section 505 of this Act: *Provided further,* That the foregoing limitation on civil penalty action under section 505 of this Act shall *not* apply with respect to any violation for which (I) a civil action under section 505(a)(1) of this Act has been filed prior to commencement of an action under this subsection, or (ii) a notice of violation under section 505(b)(1) of this Act has been given prior to commencement of an action under this subsection and an action under section 505(a)(1) of this Act is filed prior to 120 days after such notice is given.

1990); *Natural Resources Defense Council, Inc. v. Vygen Corp.,* 803 F.Supp. 97, 101 (N.D.Ohio 1992).[14]

The court does not need to resolve this dispute in the case law. Even under plaintiff's authorities, California's administrative penalty actions under California Water Code § 13385 closely parallel each of the major elements of § 1319(g) of the Clean Water Act. It is sufficient that California's procedures are analogous to federal law; even plaintiff's authorities recognize that the word "comparable" does not mean "identical."[15]

The only part of California law faulted by plaintiff is its public participation procedures, which are very closely analogous to § 1319(g). CSPA seizes on that part of the state procedures that permits a defendant to waive its right to a hearing when an administrative civil liability complaint is filed against it. Cal.Water Code § 13223(b). The City chose to use this waiver for Administrative Civil Liability Complaint 94–517. According to plaintiff, public participation rights guaranteed under § 1319(g) evaporate with the foregone hearing. However, even § 1319 does not expressly guarantee citizens the right to participate in public hearings on administrative penalty actions. Instead, § 1319(g)(4) provides three "rights of interested persons": public notice and opportunity to comment, the right to present evidence if a hearing is held, and the right to petition for a hearing if one is not held.

California law provides closely analogous measures to each of these provisions.[16] Concerning public notice and the opportunity to comment, if a defendant waives its right to a hearing, "[a]ny waiver will not be effective until 30 days from the date of this Complaint to allow other interested persons to comment on this action." Administrative Civil Liability Complaint 93–503 at 3. Thus, the Regional Water Quality Control Board provides for public notice and opportunity to comment even in the absence of a hearing.[17] Furthermore, for the controversial settlement of ACL 94–517 in particular, the Regional Board scheduled a hearing for the public's benefit, even though the City had waived its

---

**14.** A second issue concerning the meaning of "comparable state law" is how much latitude states are given in their choice of enforcement tools. In one view, as long as state laws authorize penalty assessments, citizen suits will be precluded even if states choose not to use them in a specific instance. *Arkansas Wildlife Federation,* 29 F.3d at 380; *Scituate,* 949 F.2d at 556. Plaintiff's authorities would instead require that states actually impose or seek penalties in order to bar citizen suits under § 1319(g). *Citizens for a Better Environment–California, et al. v. Union Oil Company of California,* 861 F.Supp. 889, 905–07 (N.D.Cal.1994); EPA Supplemental Guidance on Section 309(g)(6)(A) of the Clean Water Act at 4–5 (1993). This issue is not present in this case, where the Regional Water Quality Control Board did impose civil penalties.

**15.** Senator John Chafee, one of the chief sponsors of the 1987 amendments to the Clean Water Act. Senator Chafee defined "comparable" in the following manner:

[I]n order to be comparable, a state law must provide for a right to a hearing and for public notice and participation procedures similar to those set forth in section 309(g); it must include analogous penalty assessment factors and judicial review standards; and it must include other elements that are analogous to the other elements of section 309(g).

133 Cong.Rec. 1264 (Jan. 14, 1987); *see also Vygen,* 803 F.Supp. at 101; *Atlantic States Legal Foundation,* 735 F.Supp. at 1415.

**16.** *See* EPA Guidance on State Action Preempting Civil Penalties Under the Federal Clean Water Act at 4–5 (1987) (noting that "comparable" public participation procedures must "give the public notice of any proposed administrative penalty assessment, the right of any person who commented on a proposed penalty assessment to be heard and to present evidence in any hearing requested by the violator, and if the violator does not request a hearing, the right of a prior commenter to set aside the penalty and to hold a hearing thereon"). EPA has reaffirmed its 1987 view of "comparable state law" in a memorandum to regional counsel entitled Supplemental Guidance on Section 309(g)(6)(A) of the Clean Water Act (1993).

**17.** The source of this 30 day public comment period appears to be EPA regulations requiring a 30–day public comment period for the settlement of complaints. *See* Settlement of Administrative Civil Liability Complaint No. 94–517. A defendant's waiver of a hearing necessarily indicates settlement of the complaint and the proposed penalty against it. *See* Administrative Civil Liability Complaint 93–503. California is certified by the EPA to administer the NPDES program, *E.P.A. v. Cal. ex rel. St. Water Res. Control Bd.,* 426 U.S. 200, 209, 96 S.Ct. 2022, 2026–27, 48 L.Ed.2d 578 (1976), and the state appears to have followed the EPA regulation on settlements.

right to such a hearing. (Def.'s Req. Judicial Notice, Ex. J.)

The second federal right is that interested persons are notified and can present evidence if a hearing is held. California grants this right as well. 33 U.S.C. § 1319(g)(4); Cal. Gov't Code §§ 11123, 11125, 11125.7.[18] Finally, both laws grant citizens the right to petition for a hearing to set aside a penalty order. 33 U.S.C. § 1319(g)(4); Cal. Water Code § 13324. Although there are minor differences between the state and federal statutes on this point, the two are still closely analogous.[19]

In contrast to California, other states have permitted significant gaps in the public's access to the administrative penalty process. Case law finding state laws insufficiently comparable are distinguishable on these grounds. *See Vygen*, 803 F.Supp. at 101 (agency could deny the public the right to notice, comment, or a public hearing at its discretion); *Atlantic States*, 735 F.Supp. at 1415–1416 (no requirement of public comment, or, in the case of consent decrees, public notice; insufficient procedures for judicial review).

In sum, California's provisions for administrative penalty assessment represent a "State law comparable to" 33 U.S.C. § 1319(g)(4). It follows that the Regional Water Quality Board's assessment of civil penalties under ACL 93–503 and ACL 94–517 bar citizen suits under § 1319(g)(6)(A)(iii) seeking civil penalties for discharge violations for the period of their coverage.

## C.

The parties disagree as to what the period of coverage is for ACL 93–503 and ACL 94–517. As to ACL 93–503, CSPA argues that it only covered discharge violations from June 1 to August 31, 1993. Plaintiff contends that it can collect for alleged discharge violations that either post-dated ACL 93–503, or which preceded the period covered by the administrative complaint.[20] However, CSPA's attempt to recover for these early discharges runs into two obstacles. First, despite plaintiff's arguments, ACL 93–503 on its face extends back indefinitely to cover all previous violations. A court may act on a motion to dismiss based on facts conclusively established by a matter of public record. *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir.1986), *overruled on other grounds by Astoria Federal Savings and Loan Association v. Solimino*, 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). The Board is quite ex-

---

**18.** Members of the public must be able to attend all official regional board meetings and directly address the state body on each agenda item. Cal. Gov't Code §§ 11123, 1125.7; *see* Cal. Water Code § 13323(c) (reference to taking of additional evidence at board meeting). Furthermore, notice of any regional board meeting, including an agenda and short description of each agenda item, must be distributed at least ten days in advance to any person who requests notice. Cal. Gov't Code § 11125. There is one small variation in the notice requirements for any hearing under the state and federal statutes. Section 1319(g)(4) requires that notice be required for all persons commenting on a proposed order; California requires that commenters request notice in their comments. Cal. Water Code § 13323(c).

It is worth noting that the Board normally holds two hearings on an administrative civil liability matter. Cal. Water Code § 13323(b), (c). After a panel of the Board holds a hearing and proposes a ruling, the full Board independently reviews the record at a subsequent hearing. Cal. Water Code § 13323(b), (c).

**19.** The Clean Water Act *requires* the federal enforcement agency to set aside the proposed order and hold a hearing under circumstances where "the evidence presented by petitioner is material and was not considered in the issuance of the order." 33 U.S.C. § 1319(g)(4). In an analogous process, individuals may petition the state water resources board to hold a hearing in review of the regional board's action. Cal. Water Code § 13324. Unlike the federal process, under no circumstances is the state board required to hold such a hearing. *Id.* In another respect, however, the state process is more open to citizen petitions for review. California allows citizens to petition for a review hearing whether or not a hearing was held on the original decision. *Id.* In contrast, a federal review hearing is possible only in the absence of a previous hearing. 33 U.S.C. § 1319(g)(4).

**20.** As noted previously, no portion of the notice letter identifies violations from this time period. The court addresses the question both as an alternative ground to dismissing certain portions of the complaint and to give guidance in the event CSPA seeks to file an amended complaint after giving additional notice.

806

plicit in the only place where it mentions the time period covered by its proposed Administrative Civil Liability Complaint. The period of violation is described as "up to 31 August 1993."

██ Second, even if ACL 93–503 only extended back to June 1, 1993, plaintiff's earlier claims would still be barred. The Supreme Court held in *Gwaltney* that federal courts are without jurisdiction to hear citizen suits under the Clean Water Act alleging "wholly past violations." 484 U.S. at 64, 108 S.Ct. at 385. Analyzing "language and structure of . . . the citizen suit provisions" of the Clean Water Act, the Court found it "plain that the interest of the citizen-plaintiff is necessarily forward-looking." *Id.* at 59, 108 S.Ct. at 382. The Court also cautioned against an overly broad interpretation of the "scope of the citizen suit [which] would change the citizens' role from interstitial to potentially intrusive." *Id.* at 61, 108 S.Ct. at 383.

Two circuit courts have interpreted *Gwaltney* as permitting the recovery of civil penalties "only for those 'past violations that were part of or which contiguously preceded the ongoing violations.'" *Atlantic States Legal Found. v. Pan Amer. Tanning,* 993 F.2d 1017, 1020 (2nd Cir.1993); (quoting *Chesapeake Bay Found. v. Gwaltney of Smithfield,* 890 F.2d 690, 697 (4th Cir.1989) (*Gwaltney III* )), In this case, the discharge claims prior to June 1993 did not contiguously precede the ongoing violations. Instead, the Regional Board's major penalty assessment under ACL 93–503 intervened. Thus, the prior claims were part of an earlier period in the City plant's history, which as a practical matter were "wholly past violations." Accordingly, the court has no jurisdiction over these early discharge claims under *Gwaltney.*

██ As to ACL 94–517, the appropriate period of coverage is from September 1, 1993 to May 20, 1994. CSPA claims that ACL 94–517 should only be construed to extend to January 31, 1994, as proposed in the administrative complaint which the Board issued to the City on June 8, 1994. When the City paid its $250,000 penalty on July 8, however, the City stated its understanding that the payment covered all violations through May

20, 1994. The Board appears to have concurred with this understanding when it cashed the check. This is consistent with the fact that the Board apparently held a public hearing on August 4, 1994 "on the settlement reflecting all violations prior to 20 May 1994." (Def.'s Request for Judicial Notice, Ex.J.) Thus, the court finds that ACL 94–517 covers all violations from September 1, 1993 through May 20, 1994.

When taken together, the two administrative actions bar any citizen suit for civil penalties for violations comprised within the actions during the period prior to May 20, 1994.

### D.

██ There is one more piece of the statutory puzzle that needs consideration. If plaintiff is precluded from bringing a civil penalty action for violations subject to state administrative action, is plaintiff also barred from seeking injunctive or declaratory relief based on such violations? The statutory language suggests that only penalty actions are barred. Section 1319(g)(6)(A) states that violations as to which the state is diligently prosecuting or has issued a final order "shall not be the subject of a civil penalty action under . . . section 1365[, the citizen suit provision]."

The language of the statute is unambiguous that only civil penalty actions are barred. Nonetheless, the First Circuit in *North and South Rivers Watershed Association, Inc. v. Town of Scituate,* 949 F.2d 552, 557–58 (1st Cir.1992), held that the bar in § 1319(g)(6) applies to injunctive relief as well as to civil penalties. The court based this holding on a policy consideration, namely, the subordinate function of the citizen suit. However, it is perilous to reason in this way when dealing with a statute so complex as the Clean Water Act which has within it so many cross currents. *See Pendleton Woolen Mills,* 11 F.3d at 886–87 (declining to disregard the plain language of the Clean Water Act). Although there is some strength to the reasoning in *Scituate,* it ignores, for example, the provision in § 1365 which permits a citizen group that has given notice to intervene as of right in an action subsequently filed by the EPA.

This suggests that Congress did not intend to deprive citizen plaintiffs from all participation in the litigation even when their actions were barred. Moreover, there is good reason for distinguishing between civil penalties and injunctive relief:

> The language of § 1319(g)(6) ensures that an entity that has violated the CWA will not be subject to duplicative civil penalties for the same violations. On the other hand, the statute permits a federal district court to entertain an action for injunctive relief for situations where, for example, a permit holder may have paid the relevant civil penalties but continues to violate its permit limitations or where the injunctive relief obtained in the state proceedings turns out to be inadequate to address the violations at issue.

*Coalition for a Liveable West Side, Inc. v. N.Y. City Dept. of Env. Protection,* 830 F.Supp. 194, 196–97 (S.D.N.Y.1993).

 Given that the language of the statute is clear, only plaintiff's penalty remedy is barred by the prior state enforcement actions.[21]

## III.

It remains to determine what is left of CSPA's complaint. Because of deficiencies in the notice, CSPA may only go forward with the effluent violations for the three dates in late January and February 1994. Any civil remedy based upon these claims is barred, however, by the two state enforcement actions. This notice does satisfy the statutory notice requirement for injunctive relief and permits CSPA to seek further relief for violations that accrued after the notice was given. The thirteen instances listed in the complaint all post-date the enforcement actions and therefore may be the basis of both injunctive relief and civil penalties.[22]

## IV.

For the foregoing reasons, defendant's motion to dismiss is GRANTED IN PART AND DENIED IN PART. The court orders the following:

1) For plaintiff's claims of coliform, chlorine, biochemical oxygen demand, and total suspended solids violations on January 31, 1994; February 2, 1994; and February 10, 1994:

> Defendant's motion to dismiss is granted as to plaintiff's request for civil penalties, and denied as to plaintiff's request for declaratory and injunctive relief.

2) For plaintiff's claims of continuing violations on May 31, 1994; June 17, 1994; July 12, 1994; July 13, 1994; July 16, 1994; July 17, 1994; July 18, 1994; July 19, 1994; July 20, 1994; July 21, 1994; July 22, 1994; July 24, 1994; and July 26, 1994:

> Defendant's motion to dismiss is denied without prejudice. Plaintiff must show that each of these alleged violations involved breaches of the same permit conditions as those for which adequate notice has been already given: coliform, chlorine, biochemical oxygen demand, and total suspended solids effluent limitations. For each alleged violation for which plaintiff can make this showing, plaintiff may seek civil penalties and declaratory and injunctive relief. Defendant may renew its motion to dismiss for any of these alleged

**21.** Defendant also moves for dismissal of plaintiff's claims based on the primary jurisdiction doctrine, and for a more definite statement under Rule 12(e). The City argues that the court should dismiss plaintiff's surviving claims in deference to the Board's efforts under the doctrine of primary jurisdiction. Primary jurisdiction applies where "Congress, in enacting a regulatory scheme, intends an administrative body to have the first word on issues arising in judicial proceedings." *U.S. v. General Dynamics Corp.,* 828 F.2d 1356, 1362 (9th Cir.1987). This doctrine has no application here because Congress has expressly set forth the ground rules for citizen suits and only bars penalty actions in specified circumstances. The motion for more definite statement is also denied. The complaint is sufficiently detailed that defendant can frame a response. Such additional specificity as defendant may require can be obtained through discovery.

**22.** The thirteen instances may only be proceeded upon, however, if they relate to breaches of the effluent limitations for the same effluents listed in the notice letter for January 31, February 2, and February 10, 1994.

violations that involve other permit conditions.

3) For all of plaintiff's other claims:

Defendant's motion to dismiss is granted in full.

IT IS SO ORDERED.