**F I L E D**

PUBLISH

**February 2, 2007**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BILLY KARR; BETTY SCOTT;
GENE HANDLEMAN; ROWENA
HANDLEMAN,

        Plaintiffs - Appellants,

    v.

ROBERT A. HEFNER, III; THE GHK
COMPANY; RAMIIILAJ, INC.; THE
GHK CORPORATION; GHK
TRADING AND INVESTMENT
COMPANY; L.L.C.; GHK TRADING
COMPANY L.L.C.; GHK/POTATO
HILLS LIMITED PARTNERSHIP;
THE GLEBE GROUP, INC.; GLEBE
ROYALTY, LLC; WYNN-CROSBY
ENERGY; KCS RESOURCES, INC.;
EL DORADO DOZERS, INC.,

        Defendants - Appellees.

No. 05-7105

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 05-CV-117-S)**

---

Jason B. Aamodt, Miller, Keffer & Bullock, (Rayanne G. Tobey, Miller, Keffer &
Bullock; James C. Lang, G. Steven Stidham, Brian S. Gaskill, Sneed Lang, P.C.,
with him on the briefs), Tulsa, Oklahoma, for Plaintiffs - Appellants.

Frederick W. Addison III, Locke, Liddell & Sapp, LLP, Dallas, Texas, (Kirsten
M. Castañeda, Locke, Liddell & Sapp LLP; R. Forney Sandlin, Muskogee,
Oklahoma, with him on the brief for Defendant-Appellee Wynn-Crosby Energy
n/k/a Petrohawk Operating Company), P. Scott Hathaway, Melinda L. Kirk and

Conner & Winters, of counsel, Tulsa, Oklahoma, on the brief for Defendant - Appellee, KCS Resources, Inc.; Colin H. Tucker, Rhodes, Hieronymus, Jones, Tucker & Gable, and Ronald D. Wood, Jones, Gotcher & Bogan, P.C., Tulsa, Oklahoma, on the brief for Defendant - Appellee, El Dorado Dozers, Inc.; Drew Neville, Russell Cook, Hartzog, Conger, Cason & Neville, and Mary Ellen Ternes, McAfee & Taft, Oklahoma City, Oklahoma, on the brief, for Defendants - Appellees, Robert A. Hefner, III, The GHK Company, Ramiiilaj, Inc., The GHK Corporation, GHK Trading and Investment Company, L.L.C., GHK Trading Company, L.L.C., GHK/Potato Hills Limited Partnership, The Glebe Group, Inc., Glebe Royalty, L.L.C.

---

Before **TACHA**, Chief Circuit Judge, **BRISCOE**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

The Clean Water Act (CWA), 33 U.S.C. § 1251 et seq., authorizes citizen lawsuits against defendants alleged to be in violation of the CWA, *see* 33 U.S.C. § 1365(a)(1), but only when (1) the plaintiffs have given proper notice of the alleged violation to the defendants, the Administrator of the Environmental Protection Agency (EPA), and the state in which the alleged CWA violations have occurred, *see id.* § 1365(b)(1)(A); and (2) the EPA is not "diligently prosecuting" a court action against the violations, *see id.* § 1365(b)(1)(B). Billy Karr, Betty Scott, Gene Handleman, and Rowena Handleman (Plaintiffs), allegedly owners of land and water resources in Oklahoma's Pushmataha and Latimer Counties, filed such a citizen suit against (1) an individual and eight companies that we

-2-

collectively term the "GHK Defendants";[1] (2) Wynn-Crosby Energy; (3) KCS

Resources, Inc.; and (4) El Dorado Dozers, Inc. The district court dismissed

Plaintiffs' action, ruling that the EPA's investigation and entry of a consent

decree foreclosed the suit against the GHK Defendants and that Plaintiffs

provided inadequate notice to the other Defendants. Plaintiffs appeal. We have

jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.    BACKGROUND

This is the second action that Plaintiffs have brought against Defendants in

the United States District Court for the Eastern District of Oklahoma. Both

complaints alleged "wrongful and illegal construction, reconstruction, operation

and maintenance of numerous oil and gas [locations] throughout the Potato Hills

in Latimer and Pushmataha Counties in Southeastern Oklahoma causing many

sources of pollution to be created." Aplt. App. at 1, 640. Plaintiffs first

attempted to send Defendants the required notice on April 12, 2004, and they first

filed suit on June 24, 2004. The district court dismissed Plaintiffs' initial action

without prejudice on September 28, 2004, holding that it had no jurisdiction

because Plaintiffs' notice letters were insufficient under § 1365. The court

explained:

---

[1]The GHK Defendants are (a) Robert A. Hefner, III; (b) The GHK Company; (c) Ramiiilaj, Inc.; (d) The GHK Corporation; (e) GHK Trading and Investment Company, L.L.C.; (f) GHK Trading Company, L.L.C.; (g) GHK/Potato Hills Limited Partnership; (h) The Glebe Group, Inc.; and (i) Glebe Royalty, L.L.C.

Plaintiffs' approach can best be described as a "shotgun" method of citing to the entirety of the CWA, with highlighted references to particular sections and federal regulations (some of which apparently have no application to the oil and gas exploration taking place in the Potato Hills area), coupled with generic references to "construction," "pollutants," "hazardous pollutants," "streams and rivers of the Potato Hills," and "dredged wetlands." Additionally, no dates are alleged, no attempt is made to link specific violations with individual violators, and no attempt is made to link specific violations with listed well sites. This type of Notice is deficient because it (1) fails to identify the specific standard, limitation, or order violated, (2) fails to identify the activity constituting the violation, with reference to the point source of any discharge and the pollutants at issue, (3) fails to identify the dates on which the alleged violations occurred, and (4) fails to link specific violations with violators and locations.

Aplt. App. at 644–45 (footnotes omitted).

Plaintiffs sent a second round of notice letters to Defendants on November 14, 2004. They also sent copies of the letters to the EPA and the Oklahoma Department of Environmental Quality, as § 1365(b)(1)(A) directs.

On March 15, 2005, the EPA filed an action in the Eastern District of Oklahoma against two of the GHK Defendants (The GHK Company and GHK/Potato Hills Limited Partnership, which we shall refer to collectively as GHK). At the same time, the EPA submitted a proposed consent decree between itself and GHK. As the district court later summarized:

The Consent Decree was the product of an extensive investigation by the EPA into alleged CWA violations in the Potato Hills area and the resulting negotiations with GHK. On May 16, 2005, this Court approved the Consent Decree which has as its underlying purpose the resolution of all claims that GHK violated the CWA with respect to well sites in the Potato Hills area. Among other things, the Consent Decree (1) enjoins the discharge of pollutants into waters of the

-4-

United States in violation of . . . 33 U.S.C. § 1311(a); (2) requires GHK, at its own expense, to restore and stabilize the well sites to prevent further erosion and water contamination and/or mitigate damages caused by their construction activities at thirty-two sites under GHK control and ownership; (3) orders GHK to comply with the terms and conditions of applicable CWA permits during the construction of drill sites in the future, including, among other things, the development and implementation of a Stormwater Pollution Prevention Plan and the application of best management practices to minimize or eliminate stormwater discharges from the site; and (4) requires GHK to pay a $325,000 civil penalty.

*Id*. at 271–72. Although Plaintiffs had the right under § 1365(b)(1)(B) to intervene in the EPA's action, they did not exercise this right. Nor did they object to the consent decree during the 30-day public-comment period provided by 28 C.F.R. § 50.7.

Later on the same day on which the EPA filed its enforcement action, Plaintiffs filed their second complaint. The complaint raised three claims under the CWA: (1) construction at well locations without a stormwater permit, in violation of 33 U.S.C. §§ 1311, 1342, and other CWA provisions; (2) discharge of pollutants from point sources without a permit, in violation of 33 U.S.C. §§ 1311, 1317, 1341, and other CWA provisions; and (3) dredging and filling wetlands without a permit, in violation of 33 U.S.C. §§ 1311, 1344, and other CWA provisions. The complaint also raised several state-law claims, including negligence, trespass, private nuisance, public nuisance, and unjust enrichment.

The GHK Defendants moved to dismiss the complaint against them on the ground that the EPA's pursuit of the consent decree qualified as diligent

prosecution under § 1365(b)(1)(B). Their motion asserted that the EPA had investigated and addressed with the consent decree each of the three types of alleged CWA violations. With respect to Plaintiffs' first claim (stormwater), the GHK Defendants contended that the consent decree addresses 14 of the 36 GHK sites listed in Plaintiffs' complaint, and that of the remaining 22, 9 were not GHK sites (or at least GHK asserted that they were unknown to it) and 13 were "small" sites of less than five acres, which are not subject to CWA stormwater requirements. The GHK Defendants further contended that the consent decree requires remedial measures that Plaintiffs could not have compelled through their private lawsuit and covers some sites not listed in Plaintiffs' complaint. In response to the second claim (point-source discharges), the GHK Defendants contended that of the seven sites listed by Plaintiffs, three were not related to the GHK Defendants, and the consent decree resolved all violations with respect to three of the other four, while requiring some mitigation efforts at the fourth. And in response to Plaintiffs' third claim (wetlands), the GHK Defendants contended that the EPA considered all listed GHK sites, found violations in three, and found no violation in nine. They also noted that the consent decree, in addition to requiring GHK to address problems at the three sites at which the EPA found violations, required GHK to take remedial measures at six of the nine sites at which the EPA found no violations, as well as at four sites not listed by Plaintiffs.

Plaintiffs' response to the motion to dismiss did not contest any of these specific contentions concerning their three claims. Instead, to counter the diligent-prosecution defense, they challenged the timing of the EPA's action and its choice of defendants, and they raised the since-abandoned argument that 33 U.S.C. § 1319(g)(6)(B) (relating to administrative actions for civil penalties) prevented the EPA from preempting their claim. The district court rejected these arguments and found that the EPA had diligently prosecuted the alleged violations; accordingly, it dismissed the claims against the GHK Defendants on July 19, 2005.

After a motion from defendant Wynn-Crosby, the district court dismissed the remaining defendants (Wynn-Crosby, KCS, and El Dorado) on September 9, 2005. The court held that it had no jurisdiction to hear the complaint because Plaintiffs' notice letters were again insufficient. (Because the court determined that it lacked jurisdiction, it dismissed the claims against KCS and El Dorado even though they had not themselves moved for dismissal.) The court found the notices defective for substantially the same reasons as before; in particular, it held that the notices "fail to identify the specific standards, limitations, or orders alleged to have been violated," Aplt. App. at 284, and "fail to adequately identify the activities which allegedly constitute the violations," *id.* at 287.

## II. DISCUSSION

-7-

The CWA authorizes citizen suits "against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under [the CWA] or (B) an order issued by the [EPA] or a State with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). Section 1365(b) then sets the following limitations on these suits:

No action may be commenced—

(1) under subsection (a)(1) of this section—

> (A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the [EPA], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

> (B) if the [EPA] or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

\* \* \* \*

Notice under this subsection shall be given in such manner as the [EPA] shall prescribe by regulation.

We review de novo the meaning of *diligently prosecuting* under § 1365(b)(1)(B) and the requirements of proper notice under § 1365(b)(1)(A) (and the regulations thereunder); and we review the district court's factual findings for clear error. *See Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1030 (10th Cir. 2003).

**A.** **Diligent Enforcement**

Under § 1365(b)(1)(B) a citizen cannot bring a private action to enjoin violations of the CWA "if the [EPA] or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order." The district court ruled that the EPA's investigation and entry of a consent decree with two of the GHK Defendants qualified as diligent prosecution with respect to all the GHK Defendants.

Plaintiffs do not dispute that the EPA pursued enforcement of the CWA against GHK. But they urge four reasons why the EPA's actions do not foreclose their claims: (1) the EPA did not file its action within 60 days of Plaintiffs' notice; (2) the consent decree between the EPA and GHK did not address violations at all 37 well sites named in their complaint; (3) the consent decree addressed stormwater and wetlands violations but not point-source-discharge requirements under the CWA; and (4) the consent decree names only two of the GHK Defendants. We address each contention after a discussion of the diligence requirement.

**1.** **Diligence Under § 1365(b)(1)(B)**

The CWA gives primary enforcement authority to the EPA and state enforcement agencies. Under § 1365(b)(1)(B), diligent prosecution of alleged CWA violations by these agencies may preclude the filing of a citizen CWA

lawsuit.  As the Supreme Court stated in *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 60 (1987), "[T]he citizen suit is meant to supplement rather than to supplant governmental action."  Citizen lawsuits under the CWA have a merely "interstitial" role; Congress did not intend for them to be even "potentially intrusive" on agency discretion.  *Id*. at 61.

Section 1365(b)(1)(B) does not require government prosecution to be far-reaching or zealous.  It requires only diligence.  Nor must an agency's prosecutorial strategy coincide with that of the citizen-plaintiff.  As expressed by the Sixth Circuit, "[S]econd-guessing of the EPA's assessment of an appropriate remedy . . . fails to respect the statute's careful distribution of enforcement authority among the federal EPA, the States and private citizens, all of which permit citizens to act where the EPA has 'failed' to do so, not where the EPA has acted but has not acted aggressively enough in the citizens' view." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004); *see N. & S. Rivers Watershed Ass'n v. Scituate*, 949 F.2d 552, 558 (1st Cir. 1991) ("Merely because the State may not be taking the precise action Appellant wants it to or moving with the alacrity Appellant desires does not entitle Appellant to injunctive relief."); *Conn. Fund for Env't v. Contract Plating Co.*, 631 F. Supp. 1291, 1293 (D. Conn. 1986) ("[A] federal court ought not to allow a citizens' suit to proceed merely because a prior pending state suit has not alleged as many separate violations of the Act as has the citizens' suit and therefore seeks to impose a less

substantial civil penalty on the defendant.").  Moreover, an unsatisfactory result

does not necessarily imply lack of diligence.  *See Scituate*, 949 F.2d at 558

("[V]iolations may continue despite everything reasonably possible being done by

the State . . . to correct them."); *cf. Supporters to Oppose Pollution v. Heritage

Group*, 973 F.2d 1320, 1324 (7th Cir. 1992) (42 U.S.C. § 6972, which is closely

analogous to 33 U.S.C. § 1365, "does not require that the EPA succeed; it

requires only that the EPA *try*, diligently").

Particularly when the EPA chooses to enforce the CWA through a consent

decree, failure to defer to its judgment can undermine agency strategy.  If a

defendant is exposed to a citizen suit whenever the EPA grants it a concession,

defendants will have little incentive to negotiate consent decrees.  The Supreme

Court has recognized the importance of deference to the EPA's bargains:

> Suppose . . . that the Administrator agreed not to assess or otherwise
> seek civil penalties on the condition that the violator take some
> extreme corrective action, such as to install particularly effective but
> expensive machinery, that it otherwise would not be obliged to take.
> If citizens could file suit . . . in order to seek the civil penalties that
> the Administrator chose to forgo, then the Administrator's discretion
> to enforce the Act in the public interest would be curtailed
> considerably.

*Gwaltney*, 484 U.S. at 60–61.  As one court nicely put it, "An Administrator

unable to make concessions is unable to obtain them."  *Heritage Group*, 973 F.2d

at 1324; *see Ark. Wildlife Fed'n v. ICI Americas, Inc.*, 29 F.3d 376, 380 (8th Cir.

1994) ("It would be unreasonable and inappropriate to find failure to diligently

prosecute simply because [defendants] prevailed in some fashion or because a compromise was reached."). We should not interpret § 1365 in a manner that would undermine the EPA's ability to reach voluntary settlements with defendants.

Allowing the EPA to compromise does not strip citizens of their role in helping to bring about remedies for CWA violations. Indeed, the Department of Justice's regulations entitle citizens to comment on pending environmental consent decrees. *See* 28 C.F.R. § 50.7 ("It is hereby established as the policy of the Department of Justice to consent to a proposed judgment in an action to enjoin discharges of pollutants into the environment only after or on condition that an opportunity is afforded persons (natural or corporate) who are not named as parties to the action to comment on the proposed judgment prior to its entry by the court.").

In sum, our evaluation of the EPA's diligence is quite deferential. Citizen-plaintiffs must meet a high standard to demonstrate that it has failed to prosecute a violation diligently. *See, e.g.*, *Scituate*, 949 F.2d at 557 ("Where an agency has specifically addressed the concerns of an analogous citizen's suit, deference to the agency's plan of attack should be particularly favored."); *Comty. of Cambridge Envtl. Health Cmty. & Dev. Group v. City of Cambridge*, 115 F. Supp. 2d 550, 554 (D. Md. 2000) ("Most courts considering the diligence of a state or federal prosecution have exhibited substantial deference for the agency's process.");

*Williams Pipe Line Co. v. Bayer Corp.*, 964 F. Supp. 1300, 1324 (S. D. Iowa 1997) ("The plaintiff in a citizens suit bears the burden of proving the state agency's prosecution was not diligent. The burden is heavy, because the enforcement agency's diligence is presumed. The . . . agency must be given great deference to proceed in a manner it considers in the best interests of all parties involved." (citations, brackets, and internal quotation marks omitted)).

## 2. Enforcement Against the GHK Defendants

In light of our deferential review of the matter, we do not hesitate to hold that the EPA's prosecution against the GHK Defendants was diligent. The EPA chose to investigate and reach a settlement with GHK concerning essentially the same violations alleged in Plaintiffs' complaint. From the uncontested assertions of the GHK Defendants in district court, it appears that the prosecution was not only diligent but vigorous and thorough; indeed, in some respects the EPA appears to have accomplished more through its consent decree than Plaintiffs sought to achieve on their own. We reject Plaintiffs' four challenges to the district court's determination of diligence—delay, inadequate coverage of sites, inadequate coverage of violations, and inadequate coverage of defendants.

### a. Delay

Plaintiffs argue that the EPA's action cannot bar their complaint because the EPA did not file its suit within 60 days of when they sent notice of their claims. But § 1365(b)(1) does not require the EPA to act within 60 days.

Instead, it prevents *plaintiffs* from acting within 60 days of their own notice.

Plaintiffs rely on *Chesapeake Bay Foundation v. American Recovery Co.*, 769 F.2d 207 (4th Cir. 1985); but it is not helpful to their position. In that case "the government did not act within the sixty-day waiting period *and it had not yet filed suit when plaintiffs filed their independent action*." *Id.* at 208 (emphasis added). In contrast, in this case the EPA *did* file its suit before Plaintiffs—even if only by a short time.[2] Thus, as long as the EPA's prosecution was otherwise diligent, it does not matter that it commenced after the 60-day notice period provided by § 1365(b)(1)(A).

### b.     Coverage of Sites

Plaintiffs contend that the EPA's enforcement action against GHK was not diligent because the consent decree addressed only between 19 and 21 of the 37 sites listed in Plaintiffs' complaint. (Plaintiffs' complaint in fact lists only 36 sites; one is a duplicate.) As we have noted, however, we do not evaluate the EPA's diligence by requiring that its accomplishments track those sought by the citizen-plaintiffs.

In any event, Plaintiffs have not established that the EPA failed to pursue diligently all relevant sites named in their complaint. For example, regarding

---

[2]Plaintiffs argued before the district court that their second complaint related back (under Fed. R. Civ. P. 15) to their first one, and that it was therefore filed before the EPA action. The district court rejected this argument, and Plaintiffs do not pursue it on appeal.

-14-

Plaintiffs' stormwater and point-source-discharge claims, the GHK Defendants asserted in their motion to dismiss, and Plaintiffs did not dispute, that the consent decree addresses all GHK-related sites governed by the CWA's stormwater and point-source-discharge regulations. As for the wetlands-permit claims, it was the GHK Defendants' uncontradicted assertion that the EPA found no violations at nine of the twelve GHK-related sites listed by Plaintiffs and that the consent decree required mitigation at the other three sites, as well as at several other sites, including sites not listed by Plaintiffs. Nothing in the record indicates that the district court clearly erred in its assessment of the consent decree's aim—that is, that the consent decree "has as its underlying purpose the resolution of all claims that GHK violated the CWA with respect to well sites in the Potato Hills area." Aplt. App. at 271–72.

### c.     Coverage of Violations

Plaintiffs argue cursorily in their opening brief on appeal that the EPA was not diligent because it prosecuted only "stormwater and wetlands violations," whereas Plaintiffs "seek to recover as well for violations of the point source discharge requirements of the CWA." Aplt. Br. at 23. But Plaintiffs did not make this argument in their brief before the district court, leading the district court to find broadly that "Plaintiffs do not take direct issue with the EPA's diligent prosecution as manifested in the Consent Decree." Aplt. App. at 274.

Because this contention was not preserved below, we do not address it on appeal. *See Parker v. Scott*, 394 F.3d 1302, 1307 (10th Cir. 2005).

### d.    Coverage of Defendants

Plaintiffs also contend that the EPA's prosecution, which resulted in a consent decree against only two of the GHK Defendants, should not bar citizen lawsuits against the remaining GHK Defendants. We disagree.

The discretion we afford the EPA extends to its choice of defendants. Section 1365(b)(1)(B) does not speak of diligently prosecuting particular defendants but of "diligently prosecuting a civil or criminal action . . . to require compliance." Even a diligent prosecutor may decide that the strategically appropriate course of action is to seek a consent decree against a particular set of parties rather than to pursue further action against all parties alleged to have violated provisions of the CWA. *Cf. Heritage Group*, 973 F.2d at 1324 ("To say . . . that the EPA is not 'diligently prosecuting' the action if it does not sue the persons . . . the private plaintiff prefers would strip EPA of the control the statute provides." (interpreting 42 U.S.C. § 6972)). In this case, paragraph 4 of the consent decree suggests that GHK could adequately ensure compliance and that other entities who might be liable under the CWA had essentially passive, or at least subordinate, interests. The paragraph states:

> The obligations of this Consent Decree shall apply to and be binding upon GHK, including its officers, directors, successors and assigns. GHK will ensure that the obligations of this Consent Decree will be

fulfilled, either by GHK directly, or by its officers, directors, agents, employees, servants, or another person, firm, association or corporation who is, or will be, acting in concert or participation with GHK, except any one who is merely a Co-Owner of Interest in a Site, whether or not such person has notice of this Consent Decree.

Aplt. App. at 294. Plaintiffs have not indicated why the EPA's choice of defendants showed that its prosecution of violations was less than diligent.

For the above reasons, we affirm the dismissal of all the GHK Defendants from Plaintiffs' action.

## B.      Adequacy of Notice Letters

Because we affirm the dismissal of the GHK Defendants on other grounds, we consider the adequacy of Plaintiffs' notice letters only with respect to the remaining defendants—Wynn-Crosby, KCS, and El Dorado. We note in passing, however, that Plaintiffs sent some of their notice letters to all Defendants and sent others to the GHK Defendants and at least one other defendant. Accordingly, our discussion of the notice letters might well apply to the GHK Defendants also.

The district court dismissed the non-GHK defendants on the jurisdictional ground that the notices did not satisfy 33 U.S.C. § 1365. We review jurisdictional decisions and statutory constructions de novo. *See Seneca-Cayuga Tribe*, 327 F.3d at 1030; *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001).

### 1.      Section 1365(b)(1)(A)

Section 1365(b) states that notice "shall be given in such manner as the [EPA] shall prescribe by regulation." The EPA's regulation requires the notice to

provide "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, [and] the date or dates of such violation." 40 C.F.R. § 135.3(a). The guiding principle is that "the purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit." *Gwaltney*, 484 U.S. at 60. Accordingly, notice is to be evaluated from the recipient's perspective, and the notice's identification of the alleged violations must be clear:

> The language of the regulation does not suggest that the notice may be good enough if it generally orients the agency or violator as to the type of violation. . . . [T]he recipient of the notice must understand from the notice what the citizen *is alleging*—not what the citizen could allege if the citizen knew more or cared about other possible transgressions.

*Cal. Sportfishing Prot. Alliance v. City of W. Sacramento*, 905 F. Supp. 792, 799 (E.D. Cal. 1995).

Comparison with notice letters held to be sufficient can be instructive. In reversing a decision that a notice letter was insufficient because it did not identify particular dates for alleged violations, the Ninth Circuit noted that the letter "describes the problem of storm water pollution in the [relevant river;] specifically identifies pollutants associated with [the defendant's] operations;

-18-

describes in detail the sources and practices that lead to the discharge of contaminated storm water from [the defendant's] site; . . . suggests solutions for [the defendant's] storm and non-storm water discharge problems, including grading, berming, roofing, structural controls to prevent the discharge of contaminated water, and a filtration system to treat contaminated water"; and discusses "Permit requirements in detail and directs the reader's attention to the specific Permit sections that explain what is required." *WaterKeepers N. Cal. v. AG Indus. Mfg.*, 375 F.3d 913, 917 (9th Cir. 2004). Although the Ninth Circuit did not quote the notice letter extensively, it is clear from the court's description that the letter provided enough information to make the defendant's alleged violations "easy to understand." *Id.* at 918 n.2.

Similarly, the Third Circuit held valid a letter that contained a chronological list of particular violations. *See Pub. Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1242 n.3 (3d Cir. 1995). The precise information that the letter disclosed is not clear from the court's opinion, but an attachment to the letter listed at least specific pollutants, specific locations, and specific permits the defendant was alleged to have violated. *See id.* at 1242–43 & n.3.

### 2.    Plaintiffs' Notice Letters

Plaintiffs' notice letters exhibit no such specificity. They are hardly more helpful than a letter telling Defendants merely that they have violated the CWA at each listed well site. Aiming for breadth of coverage, the letters substitute

sweeping language for the particularity required by 40 C.F.R. § 135.3(a). They

consistently fail to specify the activities that constituted the alleged violations and

the laws that Defendants were allegedly violating.

To illustrate, we will consider a representative notice letter, reproduced in

full in a footnote,[3] that alleges violations of point-source-discharge limitations at

---

[3]RE:    Notice of Bill Karr, Betty Scott, and Mr. and Mrs. Gene Handleman's
          Intent to File Suit Pursuant to Section 505 of the Clean Water Act (the
          "CWA"), 33 U.S.C. § 1365(b) and 40 C.F.R. § 135.3 (2004).

Dear Prospective Defendants:

       Bill Karr, Betty Scott, and Mr. and Mrs. Gene Handleman hereby provide
you with this Notice of Intent to File Suit pursuant to the Clean Water Act (the
"CWA"), 33 U.S.C. § 1365(b) and 40 C.F.R. § 135.3 (2004). Provision of such a
notice may be required before a lawsuit is filed by the citizens under 33 U.S.C. §
1365. Notice is being provided to ROBERT A. HEFNER, III; THE GHK
COMPANIES; THE GHK COMPANY; THE GHK COMPANY, A LIMITED
PARTNERSHIP; GHK TRADING AND INVESTMENT COMPANY, L.L.C;
GHK TRADING COMPANY, L.L.C; GHK/POTATO HILLS LIMITED
PARTNERSHIP; THE GLEBE GROUP, INC.; GLEBE ROYALTY, L.L.C;
RAMIIILAJ, LLP (hereinafter the Hefner Companies); WYNNE CROSBY
ENERGY, INC, KCS RESOURCES, INC., and EL DORADO DOZERS INC. and
in the future to those additional persons now unknown who are owners and
operators of the wells and associated roads identified herein because you have
caused and continue to cause the illegal discharge of pollutants, and are violating
the Clean Water Act, and/or are the owner or operator of the wells and
associated roads identified in herein.

A.     The specific point source standards, limitations, or orders alleged to have
       been violated at the TAMI No. 1-26.

       The persons identified herein have caused pollutants to commence
and to continue to discharge from a point source into streams and waters
of the United States and their tributaries at the TAMI No. 1-26, including
associated lease roads, without [A footnote here states: "Where the TAMI
No. 1-26 is used, it refers also to the lease and service roads associated
with the well."] complying with the provisions of the Clean Water Act and

                                                             (continued...)

-20-

associated regulations relating to the point source discharge of pollutants. Specifically, the persons have caused construction to commence and continue at this location, *inter alia:*

1.    Without obtaining coverage under a general, state or regional Clean Water Act permit for the discharge of pollutants, including heavy metals, sand, rocks, and mud, from a point source at the TAMI No. 1-26;

2.    Causing a continuous release of pollutants, including hazardous and toxic pollutants, as indicated by the presence of acid rock drainage at the TAMI No. 1-26 flowing into the waters of the United States and the tributaries of the Waters of the United States, specifically to the tributary of the NAME NAVIGABLE RIVER in violation of 33 U.S.C. §§ 1311, 1317 and 1341, and other statutory and regulatory provisions of or under the Clean Water Act, including orders and regulations, without limitation 40 C.F.R. pts. 122, 123, 124, 125, 129 and 131; 40 C.F.R. §§ 122.28, 122.29; and/or any potentially applicable general permit.

3.    Causing heavy metals to continuously or intermittently discharge from the TAMI No. 1-26 into a tributary of Kiamichi River.

4.    Without documenting permit eligibility with regard to endangered species and the maintenance of critical habitat, including identifying whether federally-listed endangered or threatened species, or federally-designated critical habitat may be in the location of the well or the lease road; whether such species or critical habitat may be adversely affected by storm water discharges or storm water discharge-related activities from the project; results of the listed species and critical habitat screening determinations; any correspondence for any stage of project planning between the U.S. Fish and Wildlife Service (FWS), EPA, the U.S. National Marine Fisheries Service (NMFS), or others regarding listed species and critical habitat; and a description of measures necessary to protect federally-listed endangered or threatened species, or federally-designated critical habitat.

5.    Without documenting permit eligibility with regard to total maximum daily loads;

6.    Without complying with the National Historic Preservation Act, section 106 consultation for federally permitted construction activities at the TAMI No. 1-26;

(continued...)

7.  Discharging pollutants from TAMI No. 1-26 into tributaries of Kiamichi River without complying with the Effluent Limitations Guidelines and New Source Performance Standards for the Oil and Gas Extraction Point Sources found at 66 Fed. Reg. 6849, et. seq. or any applicable state standards;

B.  The activity alleged to constitute a violation at the TAMI No. 1-26.

    Continuing construction activities at the TAMI No. 1-26 well site and associated lease roads that have caused and continue to cause disc[h]arges of orange colored water believed to contain heavy metals and acids in illegal ways as set forth in "A. The specific point source standards, limitations, or orders alleged to have been violated at the TAMI No. 1-26" causing discharges to a tributary to Kiamichi River.

C.  The person or persons responsible for the alleged violations at the TAMI No. 1-26.

    All owners and operators of the TAMI No. 1-26 well site and associated lease roads, including the WYNNE CROSBY ENERGY, INC.; KCS MEDALLION, INC.; Hefner Companies and El Dorado Dozers.

D.  The location of the alleged violation at the TAMI No. 1-26.

    That natural gas well pad and associated lease roads associated with N. 34.69898 (latitude) and W -95.1661 (longitude) as the location information for the TAMI No. 1-26 on file with the Oklahoma Corporation Commission.

E.  The date or dates of the violations at the TAMI No. 1-26.

    From the first date of construction, approximately 1/10/2001 to present and continuing.

F.  Persons Giving Notice.

    The full name and address and telephone numbers of the person giving notice are: [Plaintiffs' contact information.]

    Bill Karr, Betty Scott, and Mr. and Mrs. Gene Handleman hereby provide

(continued...)

a particular well site, identified as "TAMI No. 1-26." Its shortcomings are pervasive. We will address a few.

### a. Point Source

To begin with, identifying a point-source-discharge violation requires identifying a point source. The CWA defines a point source as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see also* 40 C.F.R. § 122.2. It is not apparent from the notice letter what "discernible, confined and discrete conveyance" has discharged the alleged pollutants. In response to Wynn-Crosby's contention that Plaintiffs failed to identify a point source, Plaintiffs state that the source is "TAMI No. 1-26" and note that "[t]he definition of 'point source' in the CWA specifically includes wells." Aplts. Reply Br. to Aplee. Wynn-Crosby Br. at 6. But the notice letter does not suggest that pollutants are emanating from the well itself. On the contrary, the letter states that the pollution arises from "construction activities" at the well site, Aplt.

---

[3](...continued)
you with 60 days from the date of mailing of this Notice of Intent to File Suit to respond and to remediate the damages you have caused by failing to follow the mandated point source provisions of the Clean Water Act.

Aplt. App. at 204–06 (formatting altered).

-23-

App. at 205, not the operation of the well, and the letter states that the polluting activities have occurred "[f]rom the first date of construction," *id.* at 206, which would predate the well itself. The alleged violations listed in paragraphs 1 through 7 of Section A of the notice letter provide no further specification of what the point sources are.

### b. Laws Allegedly Violated

Just as the letters fail to specify a point source, they fail to identify with appropriate specificity the laws that Defendants allegedly violated. Perhaps because identifying particular regulations poses such a small burden for potential plaintiffs, notice letters must provide "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated." 40 C.F.R. § 135.3(a). The citations in Plaintiffs' letters, by contrast, frequently are to regulations that do not apply to Defendants or are irrelevant to CWA citizen-suits, and generally are too broad to help Defendants "identify the *specific* standard, limitation, or order alleged to have been violated." *Id.* (emphasis added). We consider in turn each paragraph in the letter's Section A, entitled, "The specific point source standards, limitations, or orders alleged to have been violated at the TAMI No. 1-26."

Paragraph 1 states that Defendants caused construction at the well site "[w]ithout obtaining coverage under a general, state or regional Clean Water Act permit for the discharge of pollutants, including heavy metals, sand, rocks, and

mud, from a point source at the TAMI No. 1-26." Aplt. App. at 204. The paragraph fails to cite a specific statute or regulation that requires Defendants to "obtain[] coverage under a general, state or regional Clean Water Act permit."

Paragraph 2 alleges that Defendants have engaged in construction

> [c]ausing a continuous release of pollutants, including hazardous and toxic pollutants, as indicated by the presence of acid rock drainage at the TAMI No. 1-26 flowing into the waters of the United States and the tributaries of the Waters of the United States, specifically to the tributary of the NAME NAVIGABLE RIVER in violation of 33 U.S.C. §§ 1311, 1317 and 1341, and other statutory and regulatory provisions of or under the Clean Water Act, including orders and regulations, without limitation 40 C.F.R. pts. 122, 123, 124, 125, 129 and 131; 40 C.F.R. §§ 122.28, 122.29; and/or any potentially applicable general permit.

*Id.* at 204–05. Aside from the failure to identify the waters affected (the language "NAME NAVIGABLE RIVER" is evidently an imperative intended for the letter's author), the paragraph provides no assistance regarding what provisions of a statute, regulation, or permit have been violated. Many of the citations simply do not apply to Defendants. For example, 40 C.F.R. part 123 is entitled "State Program Requirements" and addresses "the procedures EPA will follow in approving, revising, and withdrawing State programs." 40 C.F.R. § 123.1. Similarly, part 124 ("Procedures for Decisionmaking") "contains EPA procedures for issuing, modifying, revoking and reissuing, or terminating" permits. *Id.* § 124.1. Part 131 ("Water Quality Standards") sets "requirements and procedures for developing, reviewing, revising, and approving water quality standards by the

States as authorized by section 303(c) of the Clean Water Act." *Id.* § 131.1. And even if individual provisions within the cited material may govern Defendants' conduct, the citations are too general to be helpful. For example, 40 C.F.R. part 122 contains four subparts, several dozen sections, and 10 appendices; in the 2004 volumes of the Code of Federal Regulations, parts 122, 125, and 129 occupy approximately 160 pages. And 33 U.S.C. § 1311 alone contains 16 paragraphs, many of which are intricate in their own right. Paragraph 2 of the notice letter similarly refers to "any potentially applicable general permit," a reference that is almost entirely useless to the recipients. As noted above, the letter would have been no less informative if it had baldly alleged, "Defendants have violated the CWA and regulations and permits thereunder."

Paragraph 3 of the letter alleges that Defendants engaged in construction "[c]ausing heavy metals to continuously or intermittently discharge from the TAMI No. 1-26 into a tributary of Kiamichi River." Aplt. App. at 205. Again, there is no reference to any statute, regulation, or permit.

Paragraph 4 comes out of left field. It alleges that Defendants have caused construction activity

> [w]ithout documenting permit eligibility with regard to endangered species and the maintenance of critical habitat, including identifying whether federally-listed endangered or threatened species, or federally-designated critical habitat may be in the location of the well or the lease road; whether such species or critical habitat may be adversely affected by storm water discharges or storm water discharge-related activities from the project; results of the listed

-26-

species and critical habitat screening determinations; any correspondence for any stage of project planning between the U.S. Fish and Wildlife Service (FWS), EPA, the U.S. National Marine Fisheries Service (NMFS), or others regarding listed species and critical habitat; and a description of measures necessary to protect federally-listed endangered or threatened species, or federally-designated critical habitat.

*Id*. These allegations may involve the Endangered Species Act, but they do not appear to relate to the CWA. There is not even a hint of where to look in the CWA, or a regulation or permit thereunder, to see what illegality is charged.

Paragraph 5, like paragraph 4, alleges a failure of documentation. Defendants are said to have caused construction to proceed "[w]ithout documenting permit eligibility with regard to total maximum daily loads." *Id.* This is apparently another irrelevant allegation. KCS asserts on appeal that "the Oklahoma Department of Environmental Quality has not yet established any total maximum daily loads for any relevant water bodies." Aplee. KCS's Br. at 29. Plaintiffs have not disputed this contention in their reply brief, nor have they suggested that there is another agency that has set maximum daily loads.

Paragraph 6 resembles paragraph 4 in referencing a statute other than the CWA. It alleges that Defendants' construction proceeded "[w]ithout complying with the National Historic Preservation Act, section 106 consultation for federally permitted construction activities at the TAMI No. 1-26." Aplt. App. at 205. The

notice letter supplies no explanation of how a violation of the National Historic Preservation Act[4] would support a CWA citizen suit.

Paragraph 7, the final paragraph of the notice letter's Section A (which, recall, was entitled "The specific point source standards, limitations, or orders alleged to have been violated at the TAMI No. 1-26"), alleges "[d]ischarging pollutants from TAMI No. 1-26 into tributaries of Kiamichi River without complying with the Effluent Limitations Guidelines and New Source Performance Standards for the Oil and Gas Extraction Point Sources found at 66 Fed. Reg. 6849, et. seq. or any applicable state standards." *Id.* But this cited regulation, too, is facially inapplicable to Defendants, for it "applies to existing and new sources that perform oil and natural gas extraction drilling in certain *offshore and coastal waters*," 66 Fed. Reg. at 6850 (emphasis added), not to inland sites in Oklahoma. Plaintiffs argue that the regulation is more far-reaching; they point to a section of the regulation entitled "Background," which explains that the CWA

---

[4]Section 106 of the Act, 16 U.S.C. § 470f, reads in full:

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under [16 USCS §§ 470i et seq.] a reasonable opportunity to comment with regard to such undertaking.

generally "prohibits the discharge of pollutants into navigable waters except in compliance with the statute." 66 Fed. Reg. at 6852. But the referenced language does not impose a rule; it simply explains the context of the new rules.

There are other deficiencies in this notice letter, but we think it sufficient to hold that it failed to comply with 40 C.F.R. § 135.3(a) because it did not specify a point source or provide adequate guidance regarding what provision of a statute, regulation, or permit had been violated.

Similar inadequacies appear in the notice letters for alleged storm-water and wetlands violations. Indeed, the storm-water notices fail to point to any applicable regulation. There is a statutory exemption from stormwater requirements for oil-and-gas activities:

> The Administrator shall not require a permit . . . for discharges of stormwater runoff from . . . oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products located on the site of such operations.

33 U.S.C. § 1342(*l*)(2). Wynn-Crosby noted this exemption in its Answer Brief, and Plaintiffs failed to respond.

In evaluating notice letters, we are mindful of their purpose: they must allow the prospective defendants to identify the alleged problems within a 60-day period. Even if Plaintiffs' letters contain individual sentences, deeply buried, that

give Defendants some appropriate information—and from the foregoing analysis, it is not clear that they do—Defendants could not reasonably be expected to process these letters and take appropriate action within 60 days.

As Plaintiffs note, some courts have held that when a defendant takes remedial measures in response to a notice letter, the letter must have been sufficient. *See Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 820 (7th Cir. 1997); *Sierra Club v. El Paso Gold Mines, Inc.*, 198 F. Supp. 2d 1265, 1274 (D. Colo. 2002), *rev'd on other grounds*, 421 F.3d 1133 (10th Cir. 2005). But Plaintiffs have not shown that their letters were the cause of specific action by Defendants. They assert that Wynn-Crosby took remedial action in response to their letters, but they point to no facts in the record to substantiate this assertion. Wynn-Crosby disputes the assertion, contending that whatever remedial actions it took were in response to a report by the Oklahoma Corporation Commission and at any rate were taken before the notice letters at issue in this case were sent. Plaintiffs do not respond to these arguments in their reply brief.

Plaintiffs also seem to argue that letters that spur an EPA investigation must be sufficient, and they assert that there is "no question" that their notices led to the EPA's prosecution of GHK. Aplt. Br. at 16. But again they cite no evidence to substantiate their assertion.

## III. CONCLUSION

For these reasons, we AFFIRM the district court's dismissal of the GHK Defendants because the EPA's prosecution was diligent under 33 U.S.C. § 1365(b)(1)(B) and AFFIRM the dismissal of the remaining defendants because Plaintiffs' notice letters were inadequate under § 1365(b)(1)(A).